No. 06-113C
(Judge Horn)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

OAK ENVIRONMENTAL CONSULTANTS, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

STEVEN G. GILLINGHAM
Assistant Director

RICHARD P. SCHROEDER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

October 20, 2006

Attorneys For Defendant

# TABLE OF CONTENTS

PAGE(S)

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ........................ 1

STATEMENT OF THE ISSUES ........................................ 1

NATURE OF THE CASE ............................................. 2

STATEMENT OF THE FACTS ......................................... 3

A. The Contract Between OAK And The Navy .......... 4

B. The Suspension Of Work ......................... 4

C. OAK'S Requests For "Release" Of The Bonds ...... 5

D. The Deficiencies In The Boiler Connection ...... 5

E. The Termination For Convenience And OAK's Claim To The Contracting Officer ....................... 6

ARGUMENT ....................................................... 8

I. Standard For Summary Judgment ...................... 8

II. OAK Cannot Avoid Dismissal By Making Vague And Unsupported Claims Of Bad Faith ....................... 10

A. The Suspension At Issue Is Presumptively Valid 10

B. The Suspension Was Valid In Fact ............... 14

C. OAK's Allegations Of Bad Faith Are Insufficient To Support A Claim Of Bad Faith ................ 15

III. The Government Is Entitled To Summary Judgment Upon OAK's Breach Claim Relating To Its Bonding Capacity And Its Post Termination Work .......................... 17

IV. OAK Is Not Entitled To Eichleay Damages ............ 21

A. OAK Cannot Satisfy The Elements Required For Eichleay Damages ..... 22

1. OAK Cannot Demonstrate That The Government Caused A Delay Of Uncertain Duration ..... 23

2. OAK Cannot Satisfy The Second Element Of The Eichleay Test – That A Government-Caused Delay Extended The Original Time For Performance ..... 27

a. The Original Time For Performance Was Not Extended Because The Contract Was Terminated For Convenience ..... 27

b. Oak's Work To Correct A Safety Deficiency Did Not Extend The Original Time For Performance . 28

c. OAK Cannot Establish The Third Element Of Eichleay – That The Contractor Must Be On Standby And Unable To Take On Other Work During The Delay Period ..... 31

CONCLUSION ..... 34

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

A-Transport Northwest Co. v. United States,
27 Fed. Cl. 206 (1992) .............................. 11, 12

West v. All State Boiler, Inc.,
196 F. 3d 1368 (Fed. Cir. 1998) ......................... 24

Am-Pro Protective Agency, Inc. v. United States,
281 F.3d 1234 (Fed. Cir. 2002) .......................... 11

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) .................................. 8, 9

Asco-Falcon II Shipping Company v. United States,
32 Fed. Cl. 595 (1994) .............................. 11, 12

Bannum, Inc. V. United States,
56 Fed. Cl. 453 (2003) .................................. 11

C.B.C. Enterprises, Inc. v. United States,
978 F.2d 669 (Fed. Cir. 1992) ........................... 22

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) .................................. 8, 9

Freed v. United States,
34 Fed. Cl. 715 (1996) .................................. 17

Interstate General Government Contractors, Inc. v. West,
12 F.3d 1053 (Fed. Cir. 1993) ....................... 22, 23

Knotts v. United States,
128 Ct. Cl. 489, 492 (1954) ............................. 11

Melka Marine, Inc. v. United States,
187 F.3d 1370 (Fed. Cir. 1999) ...................... passim

Mingus Constructors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) ........................... 8

Nicon, Inc. v. United States,
331 F.3d 878 (Fed. Cir. 2003) ....................... passim

P.J. Dick, Inc. v. Principi,
324 F.3d 1364 (Fed. Cir. 2003) ......................... 25

San Carlos Irrigation and Drainage Dist. v. United States,
877 F.2d 957 (Fed. Cir. 1989) .......................... 18

Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.,
833 F.2d 1560 (Fed. Cir. 1987) ................... 8, 9, 17

Technical Assistance Int'l. v. United States,
150 F.3d 1369 (Fed. Cir. 1998) ......................... 18

Tecom, Inc. v. United States,
66 Fed. Cl. 736 (2005) ............................ 11, 12

Tunnell v. Wiley,
514 F.2d 971 (3d Cir.1975) ............................. 17

West v. All State Boiler, Inc.,
146 F.3d 1368 (Fed. Cir. 1998) ..................... 24, 27

Willetts v. Ford Motor Co.,
583 F.2d 852 (6th Cir.1978) ............................ 17

**MISCELLANEOUS**

RCFC 56 ................................................ passim

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| OAK ENVIRONMENTAL CONSULTANTS, INC., Plaintiff, | ) | |
| v. | ) | No. 06-113C (Judge Horn) |
| THE UNITED STATES, Defendant. | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, defendant, the United States, respectfully requests that the Court grant summary judgment in favor of the Government. We rely upon the complaint of plaintiff, Oak Environmental Consultants, Inc. ("OAK"), the parties' September 22, 2006 joint stipulations of fact, and their joint appendix.[1]

**STATEMENT OF THE ISSUES**

1. Whether plaintiff's accusations of bad faith are sufficient to overcome the presumption of good faith accorded to Government officials where the evidence shows that the Government lawfully suspended and later terminated plaintiff's contract.

---

[1] The complaint is cited "Comp. __, ¶ __." The joint stipulations of fact is cited "Jt. Facts __, ¶ __." The joint appendix is cited "A__." References are to page and, where indicated, paragraph numbers.

2. Whether, the Government is entitled to summary judgment where plaintiff cannot establish the elements of a breach of contract.

3. Whether the Government is entitled to summary judgment upon plaintiff's claim for Eichleay damages where plaintiff cannot establish multiple elements required for such a claim.

**NATURE OF THE CASE**

OAK claims that it is entitled to an equitable adjustment arising from the Navy's termination of its contract for convenience. Comp. 5-6, ¶¶ 23-25 (Count I). OAK also asserts that it is entitled to breach of contract damages, because the Navy allegedly: (1) issued a suspension of work order, when it had no basis to anticipate that work would resume after the suspension; (2) failed to "release" OAK's bond after OAK's contract was terminated; (3) required OAK to continue contract performance after the contract was terminated; and (4) "effectively" continued the suspension of work for an indefinite period following the termination. Comp. 6-7, ¶¶ 26-31 (Count II). OAK seeks $344,395.92 in damages, plus interest, costs, and attorney fees.

For the reasons set forth below, the Court should grant summary judgment in favor of the Government and dismiss the complaint.

## STATEMENT OF THE FACTS

The facts are set forth at length in the parties' joint stipulation of facts. A summary is provided below.

### A. The Contract Between OAK And The Navy

The Navy awarded OAK the subject contract on September 30, 2006. Jt. Facts 1, ¶¶ 1-2; A1. The original contract price was $2,453,163. Id. The contract required OAK to provide labor, supervision, tools, material, equipment, and transportation to perform replacement and repair services of various types at the Navy's Anchorage Housing Units, located at the Naval Station, Newport, Rhode Island. Jt. Facts 1, ¶ 4; A1. The original contract completion date was September 30, 2003. Jt. Facts 6, ¶ 24.

The contract required OAK to furnish performance and payment bonds. Jt. Facts 2, ¶ 7; A18-19. The performance bond states, among other things, as follows:

> The [bond] obligation is void if [OAK] . . . (1) [p]erforms and fulfills all the undertakings, covenants, terms, conditions, and agreements of the contract during the original term of the contract and any extensions thereof that are granted by the

> Government . . . and (2) performs and fulfills all the undertakings, covenants, terms, conditions, and agreements of any and all duly authorized modifications of the contract that hereafter are made.

Jt. Facts 2, ¶ 8; A42.

The contract also contained a clause that, among other things, permitted the contracting officer to "suspend, delay, or interrupt all or any part of the work," in writing, for a reasonable time period that the contracting officer determined to be appropriate for the Government's convenience. Jt. Facts 3, ¶ 9; A49-50.

**B. The Suspension Of Work**

On May 2, 2003, the contracting officer sent OAK a letter suspending contract performance "immediately through May 1, 2004." Jt. Facts 3-4, ¶ 10; A4. The contracting officer directed OAK to stop all on-site work "except that which is necessary to correct . . . safety deficiencies; prevent damage to existing government property, and secure existing housing units and project materials." Id. The Navy also requested OAK to provide a proposal for the deletion of all remaining work under the contract. Id.

The Navy took this action due to a pending privatization of base housing, which the Navy anticipated would involve

demolishing the exiting housing and building new housing, thus ending the need for repairs to the existing housing. Jt. Facts 4, ¶ 11; A52.

In a May 27, 2003 memorandum, the Commander, Navy Region Northeast, directed the Navy officer responsible for the contract to close out the contract. Jt. Facts 4, ¶ 12; A52. OAK submitted its close-out proposal on August 13, 2003. Jt. Facts 5, ¶ 15; A5. OAK'S close-out proposal included a cost claim that has been resolved by the parties, as well as a request for Eichleay damages, a claim that has not been resolved, and is the subject of this litigation. Jt. Facts 5, ¶¶ 16-17.

**C. OAK'S Requests For "Release" Of The Bonds**

In correspondence dated September 30, October 24, and November 5, 2003, OAK asked the contracting officer to "release" its performance bond. Jt. Facts 5-7, ¶¶ 18, 23, 25, 27, 28; A58, A60-62, A63. In its October 24, 2003 letter, OAK also claimed that it had recently learned that the Navy might not terminate the contract. Jt. Facts 7, ¶ 25

**D. The Deficiencies In The Boiler Connection**

On October 19, 2003, the contracting officer wrote to OAK and reiterated that OAK previously had been directed to stop all work, except that necessary to correct "safety deficiencies,

prevent damage to Government property, and secure exiting housing units and project materials." Joint Facts 5, ¶ 19; A59. The contracting officer noted that, when the boilers were installed the previous winter, weather did not permit roof penetrations and, therefore, a six-inch exhaust stack was temporarily connected to two existing four-inch stacks. Joint Facts 6, ¶ 20; A59. Because the Navy determined that this was a safety deficiency, OAK was directed to correct the condition by November 28, 2003. See Joint Facts 6, ¶¶ 21-22; A59.

On December 2, 2003, the contracting officer again wrote to OAK concerning the issue of the boiler connections. Jt. Facts 7, ¶ 29; A64. The contracting officer noted that, although OAK had been directed to complete that work on October 22, 2003, it had failed to do so. Jt. Facts 7-8, ¶¶ 30; A64. OAK performed the requested work from December 19 through December 23, 2003, and from February 9 through February 13, 2004. Jt. Facts 8, ¶ 31; A65-75.

**E. The Termination For Convenience And OAK's Claim To The Contracting Officer**

On December 12, 2003, prior to the date that OAK performed the corrective work, the Navy terminated the contract for the Government's convenience. See Jt. Facts 9, ¶ 37, A31-36. A December 12, 2003 letter advising OAK of the termination

indicates that a copy of the termination also was provided to OAK's surety, Lincoln General Insurance Co. A32-35. On August 3, 2005, the parties entered into a bilateral modification, settling the termination for convenience costs for $326,659. Jt. Facts 10, ¶ 41; A37-38. The parties agreed that OAK reserved its right to file a request for an equitable adjustment, or a claim for home office overhead, pursuant to the Eichleay formula. Id. Pursuant to the settlement included in the bilateral modification, OAK released and discharged the Government from any and all liability concerning the contract, except for home office overhead under the Eichleay formula. A38; see also Jt. Facts 5, 10, ¶¶ 16-17, 43.

On August 26, 2005, OAK filed a claim with the contracting officer, seeking $344,395.92 in alleged Eichleay damages. Jt. Facts 10, ¶ 44, A127-129. The Navy did not issue a final decision within 60 days. Jt. Facts 10, ¶ 45. On February 14, 2006, OAK commenced this action. Jt. Facts 10, ¶ 46.

For the reasons set forth below, this Court should grant summary judgment in favor of the Government upon OAK's claims and dismiss the complaint.

# **ARGUMENT**

## I. **Standard For Summary Judgment**

Pursuant to RCFC 56(b), a “party against whom a claim . . . is asserted or a declaratory judgment is sought may, at any time, move with our without supporting affidavits for a summary judgment in the party’s favor as to all or any part thereof.” Pursuant to RCFC 56(c), summary judgment “shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.” See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-52 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). Summary judgment is "a salutary method of disposition 'designed "to secure the just, speedy and inexpensive determination of every action."'" Sweats Fashions, Inc. v. Pannill Knitting Co., Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).

As the court of appeals emphasized in Sweats Fashions: "[T]he burden is not on the movant to produce evidence showing the absence of a genuine issue of material fact." 833 F.2d at

1563 (emphasis in original). Rather, "'the burden on the moving party may be discharged by "showing" – that is, pointing out to the [Court of Federal Claims] – that there is an absence of evidence to support the non-moving party's case.'" Id. (emphasis in original) (quoting Celotex Corp. v. Catrett, 477 U.S. at 325).

A "material fact" is one "that might affect the outcome of the suit under the governing law," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. at 248.

In this case, the parties have crafted comprehensive joint factual stipulations. This is because the material facts are well-documented and not subject to reasonable dispute. What the parties disagree on is the legal significance of those facts. Specifically, although, as detailed below, OAK's complaint contains a number of statements that we dispute, those statements constitute either unsupported characterizations or legally immaterial accusations. Therefore, they are insufficient to preclude granting summary judgment to the Government.

As demonstrated below, OAK's claims are largely based upon allegations that the Navy acted in bad faith. However, mere

allegations are insufficient to overcome the Navy's demonstrated need to suspend the contract in light of the pending privatization of the subject housing. Further, the Navy had no duty to "release" OAK's bond. In addition, OAK's allegations that the Navy improperly required it to continue performance after the contract was terminated, and that the Navy "effectively" continued the suspension of work for an indefinite period following the termination, contradict each other and are unfounded.

## II. OAK Cannot Avoid Dismissal By Making Vague And Unsupported Claims Of Bad Faith

We read OAK's complaint as alleging that unnamed Navy personnel responsible for the contract intentionally engaged in a scheme to illegally deprive OAK of its contractual rights, and that the suspension was a sham and made in bad faith. See Comp. 3-4, ¶¶ 11-12, 19-20. However, OAK's bad faith allegations are based solely upon surmise and cannot overcome the presumption of good faith. Further, OAK's bad faith allegations are unsupported by the joint stipulations of fact and the parties' joint appendix.

### A. The Suspension At Issue Is Presumptively Valid

"[I]t is well-settled that government officials are presumed to act conscientiously and in good faith in the discharge of

their duties." Asco-Falcon II Shipping Company v. United States, 32 Fed. Cl. 595, 604 (1994). This presumption is exceedingly stringent. The courts are "loath" to find bad faith. Knotts v. United States, 128 Ct. Cl. 489, 492 (1954). "Since good faith is presumed, [OAK] bears an extremely heavy burden of proving the contrary." A-Transport Northwest Co. v. United States, 27 Fed. Cl. 206, 220 (1992), aff'd. 36 F.3d 1576 (Fed. Cir. 1994). To overcome this presumption, OAK must allege and prove, by clear and convincing evidence, specific acts of bad faith by the Government. Bannum, Inc. V. United States, 56 Fed. Cl. 453, 458 (2003) (citing Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002)).[2]

---

[2] This Court's decision in Tecom, Inc. v. United States, 66 Fed. Cl. 736 (2005), did not change, and could not have changed, the "clear and convincing" standard applicable to bad faith claims of the sort presented here. In Am-Pro, the contractor sought to escape the consequences of an agreement containing a release, alleging that the release was void because it was the product of duress intentionally inflicted by the contracting officer. See 281 F.3d at 1239. Here, claiming similar intentional wrongdoing based upon an alleged "hope" anathema to OAK's interests, OAK apparently seeks to avoid the consequences of its otherwise lawful suspension and termination. These allegations of intentional wrongdoing fit neatly under Am Pro's "clear and convincing" standard. 281 F.3d at 1239-40.

Tecom's purported application of Am Pro is based upon its reading of Am-Pro as limiting the application of the "clear and convincing evidence" standard to "fraud or . . . some other quasi-criminal wrongdoing." Tecom, 66 Fed. Cl. at 769 (citing Am Pro, 281 F.3d at 1239). The Court went on

First, OAK must prove that the Government had the specific intent to harm it. A-Transport, 27 Fed. Cl. at 220. OAK, therefore, cannot show bad faith unless it demonstrates that the Government was "motivated alone by malice." Id. (quoting Gadsden v. United States, 78 Fed. Supp 126, 127, 11 Ct. Cl. 487, 489-90 (1948)).

Second, the Court cannot infer bad faith merely from a series of events allegedly adverse to OAK's interests. Asco-Falcon II, 32 Fed. Cl. at 595. There, for example, evidence of a "six and one-half year delay" in approving a request for a contract amendment was insufficient because, "even if this was proven, plaintiffs would not have shown by such fact one scintilla of proof of a specific act of bad faith or malice, nor any intent to injure plaintiffs, on the part of the government." Id.

---

to construe the cause of action in that case (implied duties to cooperate) as not requiring proof of bad faith. Id. at 770. Thus, Tecom is distinguishable. But, even assuming, for the sake of argument, that OAK theoretically could satisfy its burden of proving bad faith by something less than "clear and convincing" evidence, it would not change the outcome because, under the facts of this case, OAK cannot establish bad faith, regardless of the evidentiary standard applied.

As we demonstrate below, the Navy's actions do not evidence bad faith. They merely show that contracting officer responsibly administered a contract in a manner consistent with the circumstances confronting the Navy at the time, and consistent with the contract clauses allowing for a suspension and subsequent termination for convenience.

Indeed, not only do the contemporaneous records show that the suspension was for a legitimate purpose, they explain why it was <u>necessary</u>. Specifically, a May 27, 2003 memorandum concerning OAK's contract notes that, "[e]ven though [the housing] renovation project is almost half completed, the remaining funds can be used more wisely elsewhere." A52. In other words, the decision to suspend OAK's contract was made to avoid the waste of public funds.

In sum, OAK's conclusory allegations of bad faith are not sufficient to overcome our motion for summary judgment upon that issue.

**B. The Suspension Was Valid In Fact**

The undisputed facts underlying OAK's claims are unremarkable. Essentially, the Navy notified OAK, in early May 2003, that its contract was suspended for one year. Jt. Facts 3-4, ¶ 10; A51. The contract expressly permitted the Navy to suspend OAK's contract. Jt. Facts 3, ¶ 9; A49-50. At the time the contract was suspended, the contracting officer asked OAK to provide a proposal for deletion of the remaining work. Jt. Facts 4, ¶ 10; A51.

The suspension was due to a pending privatization. Jt. Facts 5, ¶ 11; A52. This is undisputed. Within a matter of weeks, the officer in charge of the contract was directed to close out the contract. Jt. Facts 4, ¶ 13; A53. Although the Navy continued to ask for a close out proposal, OAK did not provide the proposal until August 13, 2003, more than three months after the suspension order was issued. Jt. Facts 4-5, ¶¶ 13-14. OAK's proposal included a request for Eichleay damages. See Jt. Facts 5, ¶ 16; A54-57. During the ensuing months, the parties continued to correspond about the issue of OAK's bond, work needed to correct the deficient boiler connections, which had been determined to be a safety hazard, and certain payment and cost issues. Jt. Facts 5-9, ¶¶ 18-36; A58-118.

The Navy terminated the contract for convenience on December 12, 2003, after the initial November 28, 2003 deadline for completion of the corrective work. See id.; see also Joint Facts 9, ¶ 37; A31-36. Finally, on February 13, 2004, two months after the termination, OAK completed the boiler connection work. Jt. Facts 8, ¶ 31; A65-75.

No doubt because this chronology is so unremarkable, OAK is unable to cite any documentary evidence, or any facts or act of misconduct by Navy officials that would support a claim of bad faith.

### C. OAK's Allegations Are Insufficient To Support A Claim Of Bad Faith

In its complaint, OAK does not dispute that the Government had the general contractual right to suspend the contract. Nor does OAK dispute the Government's right to terminate the contract for convenience. Rather, OAK claims that the suspension and later termination were made with improper motives. In other words, OAK is asserting that the Navy acted in bad faith.

Specifically, OAK alleges that the suspension of work order "was, in reality, a cleverly designed subterfuge intended . . . to deny [OAK] fair and equitable compensation for costs incurred." Comp. 3, ¶ 11. Similarly, OAK characterizes the definite suspension as "actually indefinite because the [Navy]

was hoping that the pending privatization of base housing that led to the suspension of work would ultimately be overturned and that the [Navy] could then, at some point within the next year, authorize and direct [OAK] to resume work." Comp. 3, ¶ 12.

OAK further claims that the suspension effectively prevented it from seeking other work because its bonding capacity was tied up, and speculates that the issuance of the suspension order was for the sole purpose of allowing the Government to keep its options open for one year in the event that hoped-for policy changes might occur. Comp. 3-4, ¶¶ 13-14.

Similarly, OAK contends that, following the termination for convenience, the Navy "wrongfully" refused to "release" its bonding capacity and continued to treat the terminated contract as open or suspended. Comp. 4, ¶ 16. Moreover, OAK argues that the termination for convenience, like the suspension, was a "subterfuge." Comp. 4, ¶ 19. OAK also theorizes that the Navy "effectively, and unlawfully," treated its contract as both terminated for convenience and suspended at the same time." Comp. 5, ¶ 20 (emphasis in original).

However, the only support OAK offers for its allegations of bad faith are its own characterizations, unsupported accusations, and speculation. Certainly, OAK's mere characterizations and

unsupported accusations are not enough for OAK to avoid summary judgment. Indeed, "[t]he non-moving party may not discharge its burden by cryptic, conclusory, or generalized responses." Freed v. United States, 34 Fed. Cl. 715, 719 (1996) (citing Willetts v. Ford Motor Co., 583 F.2d 852, 856 (6th Cir.1978) and Tunnell v. Wiley, 514 F.2d 971, 976 (3d Cir.1975)).

Further, no evidence in the joint stipulations or the joint appendix even suggests bad faith upon the part of the Navy. Thus, OAK will be unable to establish bad faith. See Sweats Fashions, 833 F.2d at 1563 (burden is not on the movant to produce evidence showing the absence of a genuine issue of material fact; burden on the moving party may be discharged by pointing out to the court that there is absence of evidence to support non-moving party's case).

## III. The Government Is Entitled To Summary Judgment Upon OAK's Breach Claim Relating To Its Bonding Capacity And Its Post Termination Work

OAK alleges in Count II of its complaint that the Navy breached its contract with OAK by "failing to release its bond" and "requiring [OAK] to continue performance after the contract was terminated for convenience." Comp. 6, ¶ 28. However, OAK cannot demonstrate that these circumstances amount to breaches of contract. Accordingly, we are entitled to summary judgment.

To recover for breach of contract, a plaintiff must allege and prove four elements. First, a plaintiff must demonstrate that a valid contract existed between the parties. San Carlos Irrigation and Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). Second, the defendant must have undertaken an obligation or duty arising out of that contract. Id. Third, the defendant must have breached that duty. Id. Fourth, a plaintiff must prove damages arising out of the breach. Id. The party alleging a breach of contact bears the burden of proof for each element. Technical Assistance Int'l. V. United States, 150 F.3d 1369, 1373 (Fed. Cir. 1998). We are entitled to summary judgment upon the bond related claim.

When OAK entered into its contract with the Government, it acquired payment and performance bonds from Lincoln General Insurance Co. A42-46. The bonds were executed by OAK and Lincoln. Id. The Navy did not execute the bonds.

OAK cannot prevail upon its bond related claim because it cannot establish a duty by the Navy to "release" its bond or a breach of such duty. Whether, OAK should have been released from its bond or should have been bonded for other projects, was a matter between OAK and its bonding company and not between OAK and the Navy.

Indeed, OAK's claim to the contracting officer acknowledged as much. In that claim, OAK asserted that the Navy's supposed failure to "release" its bond caused its bonding company to lose confidence in OAK, which, allegedly, effectively precluded its ability to extend its bonding line. A127-128. OAK claimed that this was because the bonding company "was concerned that at least some of the reason the project was suspended" may have been due to some fault regarding OAK's work. A128. OAK claimed that the bonding company continued to lack confidence in OAK even after the bond was "released." Id.

As previously demonstrated, the contract was suspended for legitimate reasons other than OAK's performance. That the bonding company may have incorrectly misinterpreted the circumstances of the suspension does not give rise to a claim against the Navy. Indeed, the suspension of work provision states that such suspensions are permitted "for the convenience of the Government," not that they are to be used for the contractor's default. A49. Further, the Government also is not responsible for the fact that the bonding company may not have trusted OAK. Again, that is a matter between OAK and the bonding company.

OAK asserts that it was not until May 17, 2004 that the Navy "released" OAK's bond. However, the Government is not responsible for this alleged circumstance. Indeed, the December 12, 2003 termination notice shows that the bonding company was "cc'd" on that notice. A35. Further, OAK itself could have provided that notice to the bonding company at any time.

In any event, what OAK essentially suggests is that, notwithstanding the Government's right to suspend contract performance, and its lawful decision to do so, the Government is somehow liable if other parties unreasonably misinterpret the grounds for the suspension. To state that proposition is to refute it.

In Count II of its complaint, OAK asserts that the Government breached the contract "by requiring [OAK] to continue the performance of work after the contract was terminated for convenience." Comp. 6, ¶ 28. OAK cannot demonstrate that requiring performance after termination constitutes a breach, because the suspension expressly exempted the correction of safety deficiencies from its scope. A51. That OAK failed to correct the safety deficiencies of its own work prior to or during the suspension period, was its own fault. Moreover, it is

undisputed that OAK was compensated for the work. Jt. Facts 9, ¶¶ 35-36.

Because OAK cannot prevail upon its breach of contract claim, we are entitled to summary judgment.

## IV. OAK Is Not Entitled To Eichleay Damages

Even if OAK could establish a breach of contract by the Navy, OAK cannot prove that the Government is liable for Eichleay damages, which, pursuant to its agreement with the Navy, is the only cost claim OAK is entitled to pursue. Jt. Stip. 10, ¶¶ 42-43; A38.

OAK contends that, pursuant to the suspension of work clause, it is entitled to an equitable adjustment to compensate OAK for unabsorbed overhead. See Comp. 11-14. The suspension of work clause entitles a contractor to seek an adjustment when its performance is suspended, delayed, or interrupted for an unreasonable period of time by the act of the contracting officer, or by the contracting officer’s failure to act within the time specified in the contract, or within a reasonable time if not specified. Here, OAK alleges that the Navy’s suspension was indefinite, because the Government purportedly was “hoping” that the pending privatization would be overturned “at some point

in the next year" (Comp. 3, ¶12), and because the Government had OAK perform work subsequent to the suspension (Comp. 4, ¶ 17).

The only damages OAK sought to recover in its claim to the contracting officer was overhead computed pursuant to the Eichleay formula. A127-128; see Jt. Facts 5, 10, ¶¶ 16, 17, 43. This is the same relief that OAK seeks in its complaint. See Comp. 5, ¶¶21-22. Eichleay damages are unabsorbed overhead costs that arise from a Government-caused work stoppage that interrupts the contractor's income stream. Interstate General Government Contractors, Inc. v. West, 12 F.3d 1053, 1058 (Fed. Cir. 1993) (citing C.B.C. Enterprises, Inc. v. United States, 978 F.2d 669, 671 (Fed. Cir. 1992)). The Eichleay formula is used to calculate damages for unabsorbed overhead due to a period of government-caused delay in situations in which contract performance has begun. Nicon, Inc. v. United States, 331 F.3d 878, 888 (Fed. Cir. 2003).

### A. OAK Cannot Satisfy The Elements Required For Eichleay Damages

Use of the Eichleay formula is an extraordinary remedy. Nicon, 331 F.3d at 884 (quoting CBC Enterprises, 978 at 675. "Before using the Eichleay formula to quantify an amount of damages, the contractor must meet certain strict prerequisites for the application of the formula. Nicon, 331 F.3d at 883.

"First there must have been a government-caused delay of uncertain duration." Id. (citing Interstate General, 12 F.3d at 1056; see also Melka Marine, Inc. v. United States, 187 F.3d 1370, 1375 (Fed. Cir. 1999) (first requirement contractor must satisfy to demonstrate entitlement to Eichleay is that Government required contractor to stand by during Government-caused delay of indefinite duration)).

Second, the contractor "must . . . show that the delay extended the original time for performance or that, even though the contract was finished within the required time period, the contractor incurred additional costs because he had planned to finish earlier." Nicon, 331 F.3d at 883 (citing P.J. Dick, Inc. v. Principi, 324 F. 3d 1364, 1370 (Fed. Cir. 2003)).

Third, "the contractor must have been on standby and unable to take on other work during the delay period." Nicon, 331 F.3d at 883 (citing Interstate, 1056-57). Failure to meet any one of these elements is sufficient to dismiss the claim for Eichleay damages. OAK fails to satisfy any of the above elements. Therefore, OAK is not entitled to Eichleay damages.

### 1. OAK Cannot Demonstrate That The Government Caused A Delay Of Uncertain Duration

Where the Government provides the contractor with a date upon which work will restart, the contractor cannot be on

standby, because the duration of the delay is not indefinite. In Melka, 187 F.3d at 1376, the Federal Circuit held that, where the contractor knew with certainty that it could not be called upon to perform work during a specific time-period, the contractor could not have been on standby. The court further held that standby requires an uncertain delay period during which the Government can require the contractor to resume full-scale work at any time. Id. See also West v. All State Boiler, Inc., 146 F.3d 1368, 1380 (Fed. Cir. 1998) (where Government suspends work on a contract for a predetermined, definite period, the contractor is not on standby during the suspension); P.J. Dick, at 1371 (contractor must show that the Government-caused delay was not only substantial but was for an indefinite duration; for example, where Government suspends all work, but tells the contractor that work will begin again on a date certain, the contractor cannot be on standby).

In All State, 196 F. 3d at 1380, the Federal Circuit observed:

> [T]he government has the ability to control whether a contractor is on standby status during a suspension of work. By fixing, at the outset of the suspension period, a future date on which the contractor will be expected to return to work, or by allowing the contractor a 'remobilization' period at the end of the suspension . . . the government

> avoids keeping the contractor on standby during the suspension and thus avoids liability for unabsorbed overhead expenses in the future.

Similarly, in Melka, 187 F.3d 1380, the Federal Circuit noted:

> If . . . the Government so values quick start-up and early completion once the suspension of work is lifted, then it will order indefinite standby, knowing of the possible liability. That is as it should be. Certainly, freedom of action should be left to the government and the contractor.

Here, the Navy notified OAK on May 2, 2003, that work under the contract was suspended, effective immediately, through May 01, 2004. Jt. Facts, 3-4, ¶ 12; A51. OAK was ordered to stop all on-site work except for certain specified categories, including the correction of safety deficiencies. Id. The Navy also asked OAK to provide a proposal for the deletion of all the remaining work under the contract. Id.

The duration for the suspension was stated clearly and unambiguously. Indeed, there could have been no clearer statement of duration than found in the Navy's notice to OAK. OAK, upon receiving the suspension notice, had the right to anticipate that it would not be required to perform work upon the contract until May 01, 2004, with the few exceptions noted in the suspension notice, and to plan accordingly.

Notwithstanding the clear and unambiguous language of the suspension notice, OAK alleges in its complaint that the suspension was indefinite because the Navy allegedly was “hoping” that the pending privatization of base housing that led to the suspension of work would ultimately be overturned. Comp. 3, ¶ 12. OAK further claims that the suspension was a “cleverly designed subterfuge designed intended to circumvent case precedent and to deny [it] fair and equitable compensation for costs incurred.” Id. at ¶ 11.

For reasons previously discussed, OAK’s characterizations are insufficient to overcome summary judgment. OAK simply is attaching negative labels to the legitimate actions of the Navy. Missing from OAK’s complaint is even an allegation that the Navy contradicted its suspension order or even communicated its alleged “hope” to OAK. Simply put, OAK’s speculation and accusations are not proof.

OAK did not raise the prospect of being called back to work before the expiration of the suspension (with the exception of the corrective boiler connection work, which was exempted from the suspension of work order, but was not performed until after the contract was terminated (Jt. Facts 4, 8, ¶¶ 10, 31)). In any event, what OAK has come to speculate concerning why work was

suspended is irrelevant. The fact is OAK was not placed on indefinite suspension and, due to the contract termination, the period of the suspension was even briefer than originally ordered.

### 2. Oak Cannot Satisfy The Second Element Of The Eichleay Test – That A Government-Caused Delay Extended The Original Time For Performance

Although OAK's failure to satisfy the first element of the Eichleay test is fatal to its claim, it also cannot satisfy the second element – that a delay extended the original time for performance.

#### a. The Original Time For Performance Was Not Extended Because The Contract Was Terminated For Convenience

In Nicon, 331 F.3d at 884, the Court addressed a situation in which, due to a bid protest, a contractor was suspended from taking action under the contract and never received a notice to proceed. The contract was terminated prior to any work taking place. Id. The contractor requested Eichleay damages. Id. In its decision, the court held that Eichleay "is not intended to simply compensate for any government-caused delay; rather, Eichleay damages are only available when the delay causes contract performance to require more time than originally anticipated." Id.; see also All State Boiler, 146 F. 3d at 1378

(“A contractor is only injured with respect to indirect costs when the performance period of a contract is extended as a result of government-caused suspension and not because of the suspension per se.”). Further, “[d]amages are to be awarded for the period of time by which overall performance is extended, rather than the period of the suspension.” Nicon, 331 F.3d at 884. However, “[w]here there is no performance, there is no way to determine the length of time by which the delay would have extended performance. Id.

In OAK’s case, there was no extension of contract performance, because the contract effectively was ended through a suspension of work order, which was issued before the contract completion date of September 30, 2003. As explained below, OAK returned to work after the contract was terminated for approximately eight days to correct a safety deficiency. Jt. Facts 8, ¶ 31. However, this work was neither suspended nor delayed by the Government.

**b. Oak’s Work To Correct A Safety Defieiency Did Not Extend The Original Time For Performance**

OAK alleges that the Navy required it to perform additional work following the termination for convenience, and that the Navy paid OAK approximately $43,000 for work that was completed in February 2004. Comp. 4, ¶ 17. The Navy did so because the

suspension order expressly permitted the Navy to require OAK to perform work to correct safety deficiencies. A59. The work, which dealt with the ventilation of boiler exhaust stacks, was expressly found to relate to a safety issue. The Navy was well within its contractual rights to carve out exceptions for safety deficiencies, and OAK does not contend otherwise. Indeed, the suspension of work clause, incorporated by reference into the contract, expressly permitted the contracting officer to order OAK "to suspend, delay, or interrupt all or any part of the work." Jt. Facts, 3, ¶ 9; A49-50.

To the extent OAK contends that this work extended the performance period, it is mistaken. First, pursuant to the original terms of the suspension of work order, work was permitted to continue in order to correct safety deficiencies. Id. at ¶ 19; A59. Second, although the Navy noted that, when the boilers were installed the previous winter, i.e., the 2002/2003 winter season, weather did not permit roof work and repair of penetration (id. at ¶ 20; A59), the suspension occurred well after the winter. Third, the Navy requested OAK to perform the corrective safety work on the boiler connections in a letter dated October 22, 2003. Joint Facts 6, ¶¶ 21-22; A59. The

contracting officer asked for the corrective work to be completed by November 28, 2003. Id. at ¶ 22; A59.

However, OAK failed to perform the work by November 28, 2003. See Jt. Facts 7-8, ¶ 30; A64. On December 2, 2003, the contracting officer again wrote to OAK noting that the work had not yet begun, and cold weather was imminent. Id. However, OAK did not perform the work, until after the contract had been terminated for convenience on December 12, 2003. See Joint Facts 8-9, ¶¶ 31, 37.

On the facts, OAK cannot prosecute an Eichleay claim for two reasons. First, the corrective work was never suspended. Second, the delay was not the Navy's fault. Nicon, 331 F.3d at 883 ("[T]here must have been a government-caused delay of uncertain duration.") (emphasis added). Here, OAK was correcting its own work. As noted, the corrective work was necessary because, due to winter weather, roof work and repair of penetrations could not be performed. A59.

OAK, however, did not correct that deficiency until the following winter, i.e., the winter of 2003/2004, and OAK cannot demonstrate that the Navy prevented it from performing the corrective work before the contract was suspended.

**c. OAK Cannot Establish The Third Element Of Eichleay – That The Contractor Must Be On Standby And Unable To Take On Other Work During The Delay Period**

Although OAK's failure to satisfy the first two elements of Eichleay renders a discussion of the third element purely academic, OAK also cannot satisfy the third element. To successfully prosecute a claim for Eichleay damages, a contractor must have been on standby and unable to take on other work during the delay period. Nicon, 331 F.3d at 883 (citing Interstate, 1056-57).

Thus, there are two separate prongs of the third element: standby and inability to take on other work. Id. We do not address the latter, absent any applicable evidence in the joint stipulations of fact; however, it is clear that OAK cannot satisfy the standby requirement. Under the Eichleay formula, "standby" requires an uncertain delay during which the Government "can require the contractor to resume full-scale work at any time." Melka, 187 F.2d at 1376.

First, there is an absence of contemporaneous records that demonstrate that OAK was on standby. Further, to the extent that OAK claims that it is entitled to Eichleay damages because it had to perform corrective work after the suspension was issued, the facts do not support such claim. According to OAK's daily

reports, 32 hours of work were performed each day from December 19 through December 22, 2003; eight hours of work were performed on December 23, 2003; 16 hours were performed on February 9, 2004; 32 hours were performed on February 10; 16 hours were performed on Feb 11; 32 hours were performed on February 12; and 19 hours were performed on February 13. A65-75. Thus, according to OAK's records, 241 hours were spent repairing the safety deficiency, with no more than four workers on the job site on a given day during this work. Id. OAK states in its complaint that it was paid $43,000 for this work. Comp. 4, ¶ 17. The invoices show that a somewhat lesser amount was paid for this work. Joint Facts 9, ¶ 35-36 ($18,377 plus $19,193.41).

This breakdown shows that OAK was not on standby, i.e., ready to return to work rapidly at the direction of the Navy. Indeed, although the Navy requested on October 22, 2003, that the corrective work be performed by November 28, 2003, OAK did not comply. The Navy repeated its request on December 2, 2003, but no work was performed until December 19, 2006. Thus, OAK cannot reasonably assert that there was a large crew of laborers and carpenters ready to be deployed at a moment's notice. Further, when the work finally started on December 19, 2003, only four workers were sent to perform, and they worked for a week in late

December, and another week in mid-February, notwithstanding the fact that the work was supposed to have been completed by late November.

The above breakdown of OAK's corrective work also demonstrates that the work was insignificant in proportion to the value of the overall contract and, therefore, that OAK was not requested to perform "full scale" work. Melka, 187 F.2d at 1376. Specifically, the original contract was for $2,453,163.00. Joint Facts 1, ¶ 1. OAK alleges that it was approximately fifty percent complete when the contract was suspended. Comp. 2-3, ¶ 9. Thus, assuming for the sake of argument that OAK is correct, approximately $1.2 million remained under the contract. However, OAK was paid only a small fraction of that amount to correct the safety deficiency.

Being responsible for performing corrective safety work that required only a small number of workers to work for two weeks, separated by a month, and performing only a small fraction of the overall contract value, contradicts any suggestion that OAK was requested to perform "full scale" work.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court grant summary judgment in favor of the Government and dismiss the complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

***s/Steven J. Gillingham***
STEVEN J. GILLINGHAM
Assistant Director

***s/Richard P. Schroeder***
RICHARD P. SCHROEDER
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
Eighth Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562

Attorneys for Defendant

October 20, 2006

CERTIFICATE OF FILING

I hereby certify under penalty of perjury that on this 20th day of October 2006, a copy of the foregoing "DEFENDANT'S MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Richard P. Schroeder