IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| OAK ENVIRONMENTAL CONSULTANTS, INC., Plaintiff, | |
| v. | Civil Action No. 06-113C (Judge Horn) |
| THE UNITED STATES OF AMERICA, Defendant. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Drive, Suite 100
Ft. Washington, PA 19034
Tel: 215-542-2777
Fax: 215-542-2779
E-mail: mhp@phslegal.com

Attorney for Oak Environmental Consultants, Inc.

Date: June 15, 2007

# TABLE OF CONTENTS


Page

Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . 4

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . 5

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I. Jurisdiction And Standard Of Review . . . . . . . . . . . . . 12

II. Defendant's Motion For Summary Judgment Is Without Merit, And Plaintiff's Cross-Motion For Summary Judgment Awarding Equitable Adjustment For Unabsorbed Home Office Overhead Pursuant To The Eichleay Formula Is Fully Supported By The Pleadings, Depositions, Stipulations Of Fact And Affidavit Submitted Herewith . . . . . . . . . . . . . . . . . . . 14

A. The Record Demonstrates That There Was A Government-Caused Delay to Contract Performance As Originally Planned, Which Effectively Extended the Original Time For Performance . . . . . . . . . . . . . . 16

B. The Record Demonstrates That OAK Was Effectively Forced Into Standby Mode, Despite The Inclusion Of A Nominal Date Certain In The Government's May 2, 2003 Suspension Of Work Notice . . . . . . . . . . . . . . . . 20

C. The Rationale Behind The Requirement That A Suspension Of Work Be Indefinite, In Order To Warrant Eichleay Damages, Was That An Indefinite Suspension Prevents The Contractor From Obtaining Other Work In The Meantime. Regardless Of Whether The Suspension Here Was Indefinite, The Same Harm Was Caused In This Case By The Government's Unreasonable Refusal To Accede To OAK's Request To Have Its Bond Released . . . . . . . . . . . 31

III. Alternatively, The Court May Award Equitable Adjustment For Unabsorbed Home Office Overhead Under A Non-Eichleay Formula Under Nicon, Inc. V. United States, 331 F.3d 879 (2003) . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## TABLE OF AUTHORITIES

**CASES** **Page(s)**

Altmayer v. Johnson, 79 F.3d 1129, (Fed. Cir. 1996) . . . . 21,31

C.B.C. Enterprises, Inc. V. United States, 978 F.2d 669 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . 32,33

Capital Electric Co. v. United States, 729 F.2d 743, (Fed. Cir, 1984) . . . . . . . . . . 11,14,22,31

Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986) . . . . . . . . . . . . . . . . . . . 13

Eichleay Corp. ASBCA No. 5183, 60-2 BCA 2688 (1960), aff'd on recon 61-1 BCA 2894 . . . . . . . . . . . . passim

Hall v. Aqua Queen Mfg, Inc., 93 F.3d 1548 (fed. Cir. 1996) . 13

Interstate General Gov't Contractors, Inc. v. West 12. F.3d 1053 (Fed. Cir. 1993) . . . . . . . . . . . . 15,21,23

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed. 2d 538 (1986) . . 13

Mech-Con Corp. v. West, 61 F.3d 883, (Fed. Cir. 1995) . 15,21,31

Melka Marine, Inc. V. United States, 187 F.3d 1370 (Fed. Cir. 1991) . . . . . . . . . . . 15,21,31

Nicon, Inc. v. United States, 331 F.3d 878 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . passim

P.J. Dick v. Principi, 324 F.3d 1364 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . 16,21,31

Sauer v. Danzig, 224 F.3d 1340 (Fed. Cir. 2000) . . . . . . . . 15

West v. All State Boiler, Inc., 146 F.3d 1368, (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . 21,31,33

**RULES**

RCFC 56 . . . . . . . . . . . . . . . . . . . . . . . . . passim

**FEDERAL ACQUISITION REGULATIONS**

FAR 52.242-14 . . . . . . . . . . . . . . . . . . . . . . . 29,37

FAR 52.242-14(b) . . . . . . . . . . . . . . . . . . . . . 37

FAR 52.243-4 . . . . . . . . . . . . . . . . . . . . . . . 37

FAR 52.243-4(d) . . . . . . . . . . . . . . . . . . . . . . 38

FAR 52.249-2 . . . . . . . . . . . . . . . . . . . . . . . 37

FAR 52.249-2 Alternate I . . . . . . . . . . . . . . . . . 37

FAR 52.249-2(e) . . . . . . . . . . . . . . . . . . . 10,27,28

FAR 52.249-2(g)(2)(I) . . . . . . . . . . . . . . . . . . 38

FAR 52.249-2(I) . . . . . . . . . . . . . . . . . . . . . . 38

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| OAK ENVIRONMENTAL CONSULTANTS, INC., Plaintiff, | ) | |
| v. | ) | No. 06-113C (Judge Horn) |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56.1 of the Rules of the United States Court of Federal Claims, the Plaintiff respectfully submits this Memorandum in support of its Opposition to Defendant's Motion for Summary Judgment and in support of its Cross-Motion for Summary Judgment. In support of its motion, the Plaintiff relies upon the Administrative Record, the Joint Stipulation of Facts, the depositions of government personnel, the affidavit of Eduard J. Eichen, President of Oak Environmental Consultants, Inc. (attached hereto), and the following brief:

**STATEMENT OF THE ISSUES**

Whether OAK has established that based on the undisputed facts of record that it was subjected to a suspension of work of indefinite duration entitling it to reimbursement of its

unabsorbed home office overhead according to the Eichleay Formula?

Whether OAK has met all of the necessary criteria for an award of Eichleay damages, as those criteria are properly analyzed in the context of the unusual circumstances presented by this case?

Whether OAK was effectively forced into standby mode, despite the inclusion of a nominal date certain in the Government's May 2, 2003 suspension of work notice?

Whether Eichleay damages are warranted regardless of whether the suspension of work order in the instant case is deemed to have been "indefinite," given that the harm caused to OAK by the Government's actions was the very same harm meant to be addressed, in the normal situation where performance is eventually completed, by the "indefiniteness" requirement?

Whether the Court may, in the alternative, award Oak an equitable adjustment for unabsorbed home office overhead under a non-Eichleay formula, using the reasoning set forth in Nicon v. United States, 331 F.3d 878 (Fed.Cir. 2003)?

## STATEMENT OF THE CASE

This case focuses on the question on whether a contractor who has been issued a suspension of work order under FAR 52.242-14, for what is purportedly a "definite" period of one year, may nevertheless be entitled to reimbursement of unabsorbed home

office overhead expenses. The case presents an unusual factual situation to the Court because, in the usual circumstances, a definite suspension of work is followed by a resumption of the work; but here the suspension of work was followed, seven months later, by a termination for convenience.

The legal theory behind denying a contractor compensation for home office overhead during a definite period of suspension is that the contractor is free to seek other work during that “definite” period and will be entitled to remobilization costs if called back to work earlier. In this case, however, even though the suspension of work order issued on May 2, 2003 states that the suspension would last until May 1, 2004, the evidence in the record demonstrates that the Navy’s contracting and program personnel were under a directive, in May 2003, to “close out” the contract and to minimize inconvenience to OAK. There was no basis for the Navy to assume or plan that work would resume after May 1, 2004, and what nominally appeared to be a definite suspension was, in reality, an arbitrary assignment of one year to give the government the time it needed to terminate the contract for convenience – something that should and could have done at the time the suspension of work order was issued on May 2, 2003.

Since the government chose to retain the flexibility to direct a resumption of work at some indefinite time in the

future, and in fact did so even after the contract was ultimately terminated for convenience, but prior to May 1, 2004, the government, through it actions, demonstrated the indefinite duration of the suspension of work. The government was free to issue a termination for convenience at an indefinite, unspecified, time in the future, and the government was free to direct a resumption of work at some indefinite future time if the plans to privatize housing at the base changed. There can be no better evidence of the fact that there was not a "definite" one year suspension than that the suspension did not, in fact, last for one year. Accordingly, OAK is entitled to the home office overhead expenses it incurred while waiting for the government to decide what administrative action to take, and while waiting for its bond to be released so that it could bid and obtain other work.

## STATEMENT OF FACTS

The facts of the case are not in dispute and are documented in the joint stipulation of facts filed by the parties. Most significantly, those stipulations make it clear that the Navy issued a suspension of work order on May 2, 2003 and purported that the suspension would last until May 1, 2004 (Joint Stipulation of Facts, para. 10); that the Navy had been directed to close out the contract and minimize inconvenience to OAK (Joint Stipulation of Facts, para. 12; AR 132); that OAK

repeatedly asked for its bond to be released so that it could seek other work (Joint Stipulation of Facts, para. 18, 27-28); that the government failed to take any administrative action and failed to issue any specific documentation notifying OAK's surety that the bonding obligation had, in fact, been released (Affidavit of Eduard J. Eichen, para. 8-9); that the government terminated the contract for convenience on December 12, 2003 (Joint Stipulation of Facts, para. 37-38; AR 31-36); and, that the government directed Oak to perform additional work in January and February 2004 and paid OAK for that additional work (Joint Stipulation of Facts, para. 35-37).

**SUMMARY OF THE ARGUMENT**

The conventional statement of prerequisites for an award of Eichleay damages includes the following elements: (1) there must have been a government-caused delay to contract performance, (b) the original date for completion of performance must have been extended as a result, and (c) the contractor must have been required to remain on standby during the delay. These standards have been developed almost exclusively in the context of contracts which – unlike the case at bar – were delayed but ultimately performed, albeit late. When these standards, and the rationales behind them, are properly analyzed in the context of the unusual circumstances of this case, it becomes clear that OAK has fulfilled them all.

First of all, there is absolutely no dispute but that OAK stopped work on the contract, which was more than halfway complete, solely because the Government issued its May 2, 2003 suspension notice. There was, therefore, a government-caused delay.

Secondly, the suspension notice, by its terms, contemplated a one-year delay, through May 1, 2004, which accordingly extended the anticipated completion date from the original date of September 30, 2003, until September 30, 2004. The Government's argument that the contract was "ended" by means of the May 2, 2003 order is directly contradicted by the language of the suspension notice itself – which did not use any words such as "terminate" or "end," but rather provided for a fixed date on which the suspension would be lifted and work presumably resumed.

Even if one looks behind the wording of the suspension order to what appears to have been the Government's unexpressed intention, the most that can be said is that the Government intended an <u>indefinite</u> suspension preparatory to either termination at some later date or else resumption of the work at some indefinite time, in the event that the plan to privatize base housing was to change. In either case, the contract completion date must be deemed to have been extended at least until the date on which the notice of actual termination issued,

that is, December 12, 2003, some two and one-half months beyond the original contract completion date of September 30, 2003, and over seven months after the issuance of the suspension of work order on May 2, 2003.

Subsequently, the Government required OAK to perform additional work to correct a supposedly unsafe, temporary boiler venting hookup. This work was not completed until February 13, 2004, and therefore, it is clear that the contract was *de facto* extended even beyond the formal December 12, 2003 termination date through February 13, 2004. The Government's claim that this additional work was nothing more than correction of a safety defect in OAK's previous work, is belied by the fact that the supposedly unsafe venting configuration was, in fact, specifically ordered by the Government, which then paid OAK to change it the following winter. Surely no payment would have been made if the work was in fact deemed a correction of defective work by OAK. For all these reasons, therefore, the record fully supports OAK's contention that the original contract date was extended. Accordingly, prongs one and two of the Eichleay analysis have been satisfied.

The record also clearly demonstrates that OAK was effectively forced into a standby mode by the Government's actions, despite the inclusion of a nominal date certain in the May 2, 2003 suspension of work notice. The usual criteria for

determining whether or not a contractor has been placed on “standby” – which criteria, once again, have been developed in the context of projects which are eventually fully performed – are that in cases where the Government has issued a written order suspending work for a period of uncertain duration, and has required the contractor to be ready to resume work on short notice, no further evidence of “standby” status is required. Where no such written order exists, however, the contractor claiming Eichleay damages must prove that the governmental delay was substantial and indefinite, that it was required to be ready to resume work on the contract immediately and at full speed, and that there was an effective suspension of much, if not all, the work on the contract.

Although the original suspension of work order specifies on its face a one-year definitive suspension from May 2, 2003 through May 1, 2004, it is clear from a number of circumstances that the May 1, 2004 ending date was arbitrarily picked, and that OAK was in fact expected to remain on standby for the government’s convenience even beyond the original contract termination date. First of all, as OAK repeatedly informed the Government, the fact that the Government issued a suspension of work notice, rather than an immediate notice of termination for convenience, prevented OAK’s bond from being discharged, tied up all of OAK’s available bonding capacity, and prevented OAK from

seeking any replacement work for the duration of the suspension. Despite OAK's repeated pleas that the Government assist by accepting a smaller bond to cover any small bits of remaining work such as the boiler vent rearrangement, the Government turned a deaf ear to OAK's predicament. (Affidavit of Eduard J. Eichen, para. 8-9).

OAK was clearly being held on standby because the government was not certain whether, or when, the contract might be terminated for convenience, or whether higher authority might change its mind about the privatization of base housing and the eventual termination of the project for its convenience. That OAK was actually on standby status is evidenced by the fact that the Government required OAK to perform the boiler vent rearrangement as additional paid work, through February 13, 2004, well after the December 12, 2003 termination for convenience.

Furthermore, even if one were to assume – for the sake of argument only – that the Government was not hedging its bets against a potential change of policy on the base housing project, the fact remains that the contracting officer issued a notice of suspension in direct contravention of orders from headquarters which directed that the contract "be closed out" in such a way as to reduce the inconvenience to OAK. (AR 52, 132). Indeed, the contracting officer's decision to suspend work and

require submission of a close-out proposal from OAK, prior to affording OAK the benefit of a formal notice of termination, is directly contrary to the procedure specified in FAR 52.249-2(e), which contemplates that a project will first be terminated, and that discussions concerning any necessary equitable adjustments will take place afterwards.

What the record clearly establishes, therefore, is that the May 1, 2004 ending date on the May 2, 2003 suspension of work notice was never considered by anyone involved – except, unfortunately, OAK's bonding company – to represent a realistic or definitive date on which OAK could expect to resume work. Accordingly, the suspension was, in fact, an indefinite one – albeit not on its face – and OAK has fully demonstrated all those factors necessary to support a parol finding that it was placed on standby by the Government. The delay was clearly substantial and it was indefinite. OAK was expected to resume work immediately if needed. There was effective suspension of much of the work. Accordingly, the final prong of the Eichleay analysis has been satisfied.[1]

[1] The Defendant, in its Motion for Summary Judgment, has presumed that the Plaintiff is alleging bad faith on the part of the government. As undersigned counsel has confirmed to the Court, the Plaintiff is not asserting a "bad faith" argument and simply contends that the government has misconstrued the legal effect of the May 2, 2003 suspension of work order. The Plaintiff contends that the suspension was not for a definite period in fact, or as a matter of law, and that the government has

The categorical language contained in many cases concerning the Eichleay criteria was developed in the context of cases involving definite or indefinite suspensions which were followed by a resumption of work. The seminal Federal Circuit case of Capital Electric Co. v. United States, 729 F.2d 743 (Fed.Cir. 1984) makes it clear, however, that the *raison d'etre* for the rules which have been developed, is to distinguish between situations where the contractor suffers a delay, but can go ahead and obtain replacement work in the meanwhile, and situations where the contractor is prevented by circumstances – such as indefiniteness of the delay and bonding considerations – from mitigating its damages in that way. In the instant case, regardless of how the suspension is viewed, the fact remains that OAK was unable to procure replacement work through no fault of its own, because of the way in which the Government went about the termination of the project, which had the effect of continuing to tie up OAK's available bonding capacity. Accordingly, Eichleay damages should be awarded in any event.

In Nicon, Inc. v. United States, 331 F.3d 878 (Fed.Cir. 2003), the Federal Circuit held that the Eichleay formula is not

---

incorrectly denied Plaintiff the home office overhead expenses it incurred during what was, in reality, an indefinite suspension. The fact that the government took a position that may ultimately be determined by this Court to have been incorrect does not mean, nor does the Plaintiff contend, that the government acted in bad faith.

properly applied in situations where contract performance has never begun, because such situations deviate too far from the assumptions made in Eichleay. In an opinion narrowly tailored to the facts of Nicon – wherein the contract was terminated for convenience after a long delay prior to the issuance of a notice to proceed – the Court went on to hold that the contractor was nevertheless entitled to recover its unabsorbed home office overhead as part of the overall termination for convenience settlement, based on the equitable adjustment provisions of the applicable FAR provisions governing suspensions, changes, and terminations for convenience. OAK has suggested in the preceding argument sections that Eichleay may be properly applied to this case, so long as the criteria for awarding such damages are analyzed in light of the factual differences between it and most of the reported cases. On the other hand, in the event that the Court believes the instant situation to be inappropriate for an Eichleay calculation, OAK, like Nicon, should nevertheless be permitted to recover its home office overhead expenses based on the same contractual provisions as were relied upon by the Court in Nicon.

## ARGUMENT

### I. JURISDICTION AND STANDARD OF REVIEW

The Defendant has filed a motion for summary judgment, and the Plaintiff is herein responding in opposition and filing a

cross-motion for summary judgment. The purpose of summary judgment is "to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317 at 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). Summary judgment should be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law, RCFC 56(c). No genuine issue of material fact exists when a rational trier of fact could only arrive at one reasonable conclusion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996).

RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The parties agree that there are no material facts in dispute and have so advised the Court. The parties do not agree, however, on the legal significance of those facts and their collective bearing on the question of whether either side

is entitled to summary judgment. For the reasons explained below, it is the Plaintiff's position that based on the undisputed facts stipulated to by the parties, together with the Administrative Record, the depositions, and the affidavit of Mr. Eduard J. Eichen, the Plaintiff is entitled to summary judgment because a trier of fact could only reasonably conclude that OAK was subjected to an indefinite suspension of work entitling the company to reimbursement of its unabsorbed home office overhead expenses. Similarly, the government's motion for summary judgment should be denied because the legal conclusions it asks the Court to adopt are not supported by the record or applicable case law.

## II. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT IS WITHOUT MERIT, AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AWARDING EQUITABLE ADJUSTMENT FOR UNABSORBED HOME OFFICE OVERHEAD PURSUANT TO THE EICHLEAY FORMULA IS FULLY SUPPORTED BY THE PLEADINGS, DEPOSITIONS, STIPULATIONS OF FACT AND AFFIDAVIT SUBMITTED HEREWITH

In Capital Electric Co. v. United States, 729 F.2d 743 (Fed Cir. 1984), the Federal Circuit Court of Appeals formally adopted and sanctioned the practice of awarding damages for extended, unabsorbed home office overhead in situations where Governmental delay, including but not limited to formal suspensions of work, resulted in the contractor being unable to mitigate those expenses through the acquisition of other work. The formula adopted by the Court for the award of such damages

is commonly referred to as the "Eichleay Formula," after a decision by the Armed Services Board of Contract Appeals in Eichleay Corp., ASBCA No. 5183, 60-2 BCA ¶ 2688 (1960), aff'd on recon., 61-1 BCA ¶ 2894, in which it was applied.

The conventional statement of prerequisites for the award of Eichleay damages which has been developed almost exclusively in the context of contracts which are delayed, but ultimately performed, albeit late, is as follows:

> To show entitlement to these *Eichleay* damages, the contractor must first prove that there was a government-caused delay to contract performance (as originally planned) that was not concurrent with a delay caused by the contractor or some other reason. Sauer Inc. v. Danzig, 224 F.3d 1340, 1347-48 (Fed.Cir. 2000). The contractor must also show that the original time for performance of the contract was thereby extended, or that he finished the contract on time or early but nonetheless incurred additional, unabsorbed overhead expenses because he had planned to finish even sooner. Interstate Gen. Gov't Contractors, Inc. v. West, 12 F.3d 1053, 1058-59 (Fed Cir. 1993. Once the contractor has proven the above elements, it must then prove that it was required to remain on standby during that delay. *Id.* If the contractor proves these three elements it has made a prima facie case of entitlement and a burden of production shifts to the government to show that it was not impractical for the contractor to take on replacement work and thereby mitigate damages. Melka [Marine, Inc. v. United States,] 187 F.3d [1370] at 1376 [(Fed.Cir. 1999)].[2]

[2] Once this prima facie case is made out, there is a heavy burden which falls on the government to demonstrate that the case is one of the very few in which it was not impractical for the contractor to take on replacement work. Melka Marine, supra, 187 F.3d at 1378, citing All State, supra, 146 F.3d at 1380 and Mech-Con Corp. v. West, 61 F.3d 883,886 (Fed.Cir. 1995).

P.J. Dick Inc. v. Principi, 324 F.3d 1364, 1370 (Fed.Cir. 2003). As will be argued below, OAK fulfills each of the foregoing criteria, when such criteria are properly analyzed in the context of the unusual circumstances of this case.

### A. The Record Demonstrates That There Was a Government-Caused Delay To Contract Performances As Originally Planned, Which Effectively Extended the Original Time For Performance.

The original contract completion date was September 30, 2003. Joint Stipulation of Facts, p. 6, ¶ 24. By the terms of the May 2, 2003 suspension of work notice, (AR 51) which suspended work for an entire year, the contract completion date was advanced to May 1, 2004. Moreover, the contract itself was not terminated for convenience until December 12, 2003, AR 31, an action totally inconsistent with any theory other than that the contract had been extended beyond the September 30, 2003 date.

The Government argues, in its Motion for Summary Judgment at p. 28, that there was no extension of contract performance "because the contract was ended through a suspension of work order, which was issued before the contract completion date of September 30, 2003." This assertion is at odds with the Government's later assertion that the suspension was "definite" and due to end on May 1, 2004.

Logically, the Government cannot argue both sides of the issue. Either it considers the suspension of work notice to be valid on its face, with a real, non-fictional, definitive ending date of May 1, 2004, in which case the contract completion date was clearly extended by the one year suspension until May 1, 2004, or else it agrees with OAK that the suspension notice was, in effect, meant to be indefinite and contemplated the earlier termination of the contract for the convenience of the Government on some indefinite date in the future. In this latter circumstance, the Defendant agrees with OAK that the suspension was, in fact, an indefinite one within the meaning of the cases interpreting Eichleay, and that the contract completion date was effectively suspended until at least December 12, 2003, the date on which a formal notice of termination was issued, or until May 17, 2004 when OAK's bond was released. (Affidavit of Eduard J. Eichen, para. 15; AR 125).

It is significant that during the depositions of the government personnel involved in the administration of the project, not a single one took responsibility for coming up with the one year time period specified in the May 2, 2003 suspension of work notice (AR 51). In fact, even the Resident Officer in Charge of Construction, who drafted and signed the letter, responded to the question "How did you determine the length of

the suspension?" by testifying that "I do not recall how I came up with the date May 1, 2004, why that date." (Appendix, Transcript of Deposition of Anthony Zanoli, page 23, lines 5-8). It appears, therefore, that the May 1, 2004 date was arbitrarily selected to give the government one year to terminate the contract for convenience, something that could have, and should have, been done on May 2, 2003. Higher authority had advised the base personnel that the project was to be closed out and that the contract was to be terminated for convenience (AR 52, 130). A suspension of work should not be deemed to be "definite" simply because the government assigns a date certain in a letter; the surrounding circumstances should also be taken into consideration.[3] Here, the government knew, with certainty, that the work was not going to resume after May 1, 2004, and that the contract was going to be terminated for convenience. The decisions that allow the government to deny payment of extended home office overhead expenses in the event of a

[3] The Contracting Officer, Denise Abraham, testified that "My understanding is that if it's suspended for a definite period of time there are limited costs that the contractor is entitled to." When then asked "And what about if it's for an indefinite period?" the Contracting Officer responded "I believe there are more costs that that opens up to." When further asked "So as a matter of policy in your office in Newport is that why when you issue suspensions it's for a definite period of time?" the Contracting Officer responded "Yes." (See Transcript of Deposition of Denise Abraham, page 57, lines 10-23).

"definite" suspension most assuredly were not intended to apply to a situation, like the one at hand, where the government did not intend for the work to actually be suspended for one year.

Furthermore, it is undisputed that the Government did in fact request that OAK complete additional work on venting the boilers that had been installed in the housing units the previous winter - work which extended well past even the formal date of termination for convenience, December 12, 2003. As the Affidavit of Eduard Eichen, attached hereto, clearly demonstrates, the boilers' new 6" exhaust stacks were temporarily connected to two existing 4" exhaust stacks, <u>at the direction of Government officials</u>, because of snow and other winter weather conditions which prevented the new stacks being independently vented. (Affidavit of Eduard J. Eichen, para. 13-14). In September of 2003, however, Government safety inspectors required that the temporary venting be corrected to the proper permanent configuration, and OAK was asked to, and did, accomplish the requested work on December 19-23, 2003 and on February 9-13, 2004. Joint Stipulation of Facts, pp. 6-7, ¶¶ 20-22, AR 64, 143. Clearly, therefore, the Government by its actions extended the contract through at least February 13, 2004.

The Government attempts to explain away the fact that it asked OAK to perform additional work on the boilers, by

characterizing that work as the mere correction of a safety violation, and by claiming that Oak was merely "correcting its own work, which was "not the Navy's fault." See Defendant's Motion for Summary Judgment, p. 26, 28-30. As previously discussed, this is not true. The stacks were configured as they were during the winter of 2003 at the express direction of the Government, and accordingly, OAK was not responsible for their correction. This is attested to both by both Mr. Eichen in his attached affidavit, and by the admitted circumstance that the Navy paid OAK for the "corrective" work (Joint Facts, p. 9, ¶¶ 35-36), which it clearly would not have done had OAK been responsible for the alleged defect. Accordingly, the facts of record before this Court are exceptionally clear, and demonstrate without a doubt that there was a Government-caused delay to the contract completion date originally scheduled. Accordingly, the first two prongs of the Eichleay analysis are fully satisfied.

**B. The Record Demonstrates That OAK Was Effectively Forced Into Standby Mode, Despite the Inclusion of a Nominal Date Certain in the Government's May 2, 2003 Suspension of Work Notice.**

The criteria in use for determining whether or not a contractor has been placed on "standby" have been developed in the context of projects which are eventually fully performed and are as follows. In cases where the Government has issued a

written order suspending work for a period of uncertain duration, and has required the contractor to be ready to resume work on short notice, no further evidence of "standby" status is required. P.J. Dick, 324 F.3d at 1371; Interstate General Government Contractors, supra, 12 F.3d at 1055, 1057, n.4. Where no such written order exists, however, then the contractor claiming Eichleay damages must prove that the governmental delay was substantial and indefinite, that it was required to be ready to resume work on the contract immediately and at full speed, and that there was effective suspension of much, if not all, the work on the contract. P.J.Dick, 324 F.3d at 13471-1372; West v. All State Boiler, Inc., 146 F.3d 1368, 1373 (Fed. Cir. 1998); Melka Marine, supra, 187 F.3d at 1376; Mech-Con Corp, supra, 61 F.3d at 887; Altmayer v. Johnson, 79 F.3d 1129, 1134 (Fed.Cir. 1996).

OAK contends, with ample support in the record, that although the original suspension of work order specifies on its face a one-year definitive suspension to end on May 1, 2004, this date was arbitrarily picked, and that OAK in fact was expected to remain on standby for the government's convenience throughout the entire period up until May of 2004. This is apparent from a number of facts.

First of all, as OAK repeatedly informed the Government, the fact that the Government issued a suspension of work notice,

rather than a notice of termination for convenience, prevented OAK's bond from being discharged. Since the bond was so large as to completely tie up OAK's bonding capacity (See Affidavit of Eduard J. Eichen, para. 3), OAK was prevented from bidding upon any replacement work at all. This fact is documented in a series of communications, beginning in August of 2003, in which OAK requested that the Government "release" the bond so that it could go bid on other work. See Joint Stipulation of Facts, pp. 5, 7, 18, 27-28; AR 55-58, 60-63. In fact, in an effort to mitigate the damage it was suffering, and in the face of the Government's failure to respond to its requests, OAK went so far as to offer to supply a much smaller bond to cover small items such as the work that had been requested to change the venting configuration of the boilers. AR 61. The Government, however, failed to respond to even this reasonable proposal.

A number of the decided cases recognize the important ways in which a limited bonding capacity can impact upon a contractor, rendering it unable to obtain replacement work during the course of a suspension of work. In the seminal case, Capital Electric, supra, the Federal Circuit held, for example, that the combination of uncertainty as to the duration of the government-caused delays, together with the contractor's limited remaining bonding capacity, resulted in the contractor's inability to acquire replacement work and its consequent

entitlement to Eichleay damages. 729 F.2d at 745-746. In Mech-Con, supra, the Court held similarly that the contractor, who like OAK was a relatively small company with limited bonding capacity, was entitled to Eichleay damages even though its project for the government was largely completed. Cf. Interstate General Government Contractors, supra, 12 F.3d at 1055 (noting that contractor had been unable to take on replacement work due to its entire bonding capacity having been tied up by the governmental contract at issue, but denying Eichleay damages on other grounds, because the completion date was not delayed.

Despite the fact that OAK was very clearly being hurt by having its bonding capacity tied up on a project that was clearly slated for termination, the Government failed to take any action at all in response to OAK's repeated pleas, to assist in ameliorating the bonding situation. The reason for this failure, apparently, was that the Navy representatives at Newport, RI still harbored hopes - in the face of their superiors' clear directives otherwise - that the order directing privatization of the subject housing might be rescinded, and work on the project allowed to continue. (Affidavit of Eduard J. Eichen, para. 5) In the course of its November 24, 2003 letter regarding its continuing bonding difficulties, OAK President Eduard Eichen alluded to having

heard that something like this might be happening. AR 61. This belief is borne out by the June 22, 2005 letter from former Assistant Resident Officer in Charge of Construction, Nolan Redding, to Jeff Longenecker at Commerce Bond Services Group, which indicated that the government did not release OAK's bond because it was thought that "the privatization would not go through and the project could be restarted at anytime. OAK was asked to remain on standby and prepared to continue the work during this period . . . . " AR 125. Clearly, therefore, despite the apparent definite work-resumption date contained in the May 2, 2003 notice of suspension, the facts of record indicate that the suspension was, in fact, indefinite, and that OAK was being asked to remain, very clearly, on standby.[4]

The Government, in its Motion for Summary Judgment, conveniently fails to mention at all Mr. Redding's letter admitting that OAK was, effectively, placed on standby. See Motion for Summary Judgment, p. 26. By failing to address this evidence, its argument fails. The fact is that OAK's contentions are adequately supported by evidence in the record, and summary judgment for OAK, not the Government, is clearly indicated in this case.

[4] The Defendant even states, in its Motion for Summary Judgment, on page 14, that "the suspension was due to a pending privatization," clearly implying that the duration of the suspension was indefinite.

Furthermore, as argued in greater detail in the preceding section, OAK was required to perform additional work to alter the configuration of vents for the boilers that were installed in the subject housing units prior to the project's suspension of work which, contrary to the Government's contentions, did not result from any fault of OAK at all. On the contrary, OAK was called in to alter a vent configuration which had been specifically ordered by the Navy the previous winter, and OAK was paid for this work in the manner of a change order (as it would not have been had it been responsible for the alleged "safety violation"). See Affidavit of Eduard Eichen; Joint Stipulation of Facts, pp. 6-7, ¶¶ 20-22, AR 64, 143. Clearly, therefore, the Government's own actions support the statement by Nolan Redding, that OAK was treated as on-call for further work as needed on the project.

From all of the above, therefore, it is crystal clear that regardless of the fictional May 1, 2004 ending date contained in the suspension of work order, the suspension was in fact treated by the Government as an indefinite one, and OAK was treated as very much on call, and placed in a position such that its bond could not be released. Accordingly, the "standby" requirement for Eichleay damages has been fully met.

Furthermore, even if one were to assume, for the sake of argument only, that the Government was not hedging its bets

against the possibility that the privatization might not go through, the fact remains that for whatever reason, or no reason, the Resident Officer in Charge of Construction issued the suspension in clear contradiction of the directive from the Commander of Navy Region Northeast that "this contract be closed out." (Joint Facts pp. 3-5, ¶¶ 9, 12; AR 51-52[5]) and refused to give OAK the benefit of that directive, namely, a clear and timely termination order and release of its bond so that it could go ahead and procure other work.

The documents in the administrative record reveal that it was recognized that the contract was going to be terminated for the convenience of the government as early as April 23-24, 2003. See series of e-mails, AR 130-132, as well as later communications dated June 2, 2003 (AR 137, 141). Furthermore, it was also stated that "[i]n order to stop the work, EFANE would like to have an activity/regional request so they can notify the contractor and reduce the inconvenience to him as soon as possible . . . ." AR 132. (Emphasis added).

[5] Indeed, the issuance of a one-year supposedly "definite" suspension is internally contradictory of the suspension notice's other directive that OAK "please provide a proposal for the deletion of all the remaining work under this contract to this office." Joint Facts, p. 3, ¶ 9; AR 51.

The action actually taken by the Navy did not comport with any of these directives. Instead of taking the straightforward action requested, that is terminating the contract for convenience - which would then require an assessment of the proper equitable adjustment to OAK per the procedure set forth in FAR 52.249-2(e)[6] - the Navy representative instead issued a suspension until May 1, 2004, which everyone concerned knew or should have known represented a fictional date in light of the clearly stated directives from the Commander of Navy Region Northeast, but which clearly had the effect of tying up all or most of OAK's bonding capacity and preventing it from bidding other work in the interim.

The Government engages in a lengthy argument contending that the "release" of the bond was a matter solely between OAK and its bonding company, a matter in which the Government had no involvement at all. See Motion for Summary Judgment, pp. 18-20. In the same breath, however, the Government acknowledges OAK's

---

[6] The Government argues, at p. 13 of its Motion for Summary Judgment, that the suspension was not only for a legitimate purpose, but "necessary" to avoid a "waste of public funds," given that the May 27, 2003 directive also included the statement that "[e]ven though subject renovation project is almost half completed, the remaining funds can be used more wisely elsewhere." AR 52. Nowhere is it explained, however, why the same objective could not have been achieved by terminating the contract outright. Indeed, since outright termination followed by settlement negotiations is the procedure set forth in the FAR, the suspension would appear to have been actually illegitimate.

concern that the bonding company may have misunderstood the suspension to mean that there were concerns about the quality of OAK's performance. Id. Additionally, of course, the issuance of a suspension order with a specified ending date would be calculated to induce the bondsman to not discharge the bond until that specified date had come and gone, and the work involved had been resumed and completed.

Thus, the Government, in taking its completely "hands-off" position, ignores the stark realities of the situation, which were that the suspension order that was issued did not match the realities of the actual situation and accordingly was misleading. It also ignores the fact that OAK was vociferously complaining of the unfairness inherent in the situation from its point of view, and that any conceivable remaining mop-up work, such as the reconfiguration of the boiler vents, could have been more than adequately covered by a much smaller bond. The refusal of the Government to agree to such an eminently reasonable proposal as OAK's proposal to agree to downsize the bond demonstrated a startling callousness to OAK's situation and completely disregarded the headquarters' directive to "reduce the inconvenience to him as soon as possible . . . ." AR 132.

Significantly, FAR 52.249-2(e) provides that "*[a]fter* termination, the Contractor shall submit a final termination settlement proposal to the Contracting Officer in the form and

with the certification prescribed by the Contracting Officer. The Contractor shall submit the proposal promptly, but no later than 1 year from the effective date of termination . . . ." There is no provision in the FAR which would authorize a contracting officer to require its contractor to submit a termination proposal *prior to* issuing an actual notice of termination, and certainly not while tying up the contractor's ability to procure replacement work and/or the release of its bond by the mechanism of a work suspension order that on its face appears to contemplate resumption of work on a date certain in the future. Indeed, the procedure that was adopted here flew directly in the face of the headquarters' directive to "reduce the inconvenience" to OAK.[7]

[7] Indeed, the contract itself incorporated FAR 52.242-14 (Suspension of Work), providing that a suspension must be "appropriate" for the convenience of the Government, and making such suspension actionable in the event that it is "for an unreasonable period of time." Clearly, a one-year "suspension" is unreasonable when it so needlessly delays the contractor's ability to move on to procuring other work.

The May 27, 2003 directive from the Commander, Navy Region Northeast specifically requested that the contracting officer close out the contract, "while recouping as much money as possible, *by obtaining credits for materials already purchased*." AR 52 (emphasis supplied). Nowhere is it suggested in that directive that money should be recouped by keeping OAK in an unproductive and disastrous limbo while the termination settlement was negotiated.

Far from reducing the inconvenience to OAK, however, and far short of terminating the contract as directed, the Navy merely suspended work, picking an artificial end date for that suspension which had absolutely no relationship at all to the Government's actual decision to terminate.

It is clearly established on this record that the May 1, 2004 ending date on the May 2, 2003 notice of suspension was never considered by anyone involved - except, unfortunately, OAK's bonding company - to represent a realistic date on which OAK could expect to resume the work. Work was expected to resume at the Navy's convenience to fix its boilers, and at the Navy's convenience if it changed its mind. Barring either of those two eventualities, the suspension of work was expected to terminate with the issuance of a notice of termination for the convenience of the Government on some indefinite date and well before May 1, 2004. Under no set of facts of record in this case could any of the parties have seriously considered that the suspension of work would end on May 1, 2004. Therefore, the suspension was clearly indefinite. In fact, the only thing that was definite was that the suspension would <u>not</u> last for one year.

Accordingly, OAK has fully demonstrated all those factors necessary to support a parol finding that it was placed on standby by the Government. The delay was clearly substantial

and it was indefinite. OAK was expected to resume work immediately if needed. There was effective suspension of much of the work. P.J.Dick, 324 F.3d at 13471-1372; West v. All State Boiler, Inc., 146 F.3d 1368, 1373 (Fed. Cir. 1998); Melka Marine, supra, 187 F.3d at 1376; Mech-Con Corp, supra, 61 F.3d at 887; Altmayer v. Johnson, 79 F.3d 1129, 1134 (Fed.Cir. 1996). Accordingly, the final prong of the Eichleay analysis has been satisfied.

**C. The Rationale Behind the Requirement That a Suspension of Work Be Indefinite, In Order to Warrant Eichleay Damages, Was That An Indefinite Suspension Prevents the Contractor From Obtaining Other Work In the Meantime. Regardless of Whether the Suspension Here Was Indefinite, the Same Harm Was Caused In This Case By the Government's Unreasonable Refusal to Accede to OAK's Request To Have Its Bond Released.**

In Capital Electric, 729 F.2d 743 (Fed Cir. 1984), the case in which the Federal Circuit adopted Eichleay and first set forth the criteria for its application, the Federal Circuit Court of Appeals formally adopted and sanctioned the practice of awarding damages for extended, unabsorbed home office overhead in situations where Governmental delay, including but not limited to formal suspensions of work, resulted in the contractor being unable to mitigate those expenses through the acquisition of other work. The formula adopted by the Court – which was first applied by the Armed Services Board of Contract

Appeals in Eichleay Corp., ASBCA No. 5183, 60-2 BCA ¶ 2688 (1960), aff'd on recon., 61-1 BCA ¶ 2894 – was applied in Capital Electric because the contractor demonstrated "that it could not have taken on any large construction jobs during the various delay periods due to the uncertainty of the delays and . . . due to the limitation on its bonding capacity." 729 F.2d at 745-746. In other words, the original opinion in Capital Electric focused on *both* considerations, and not exclusively upon the uncertainty of the delay.

Later cases, of course, have stated the Eichleay test in more categorical terms, holding that the contractor must in fact be "on standby" to be relieved of any duty to mitigate unabsorbed home office overhead losses. This doctrine, of course, has developed in the context of cases in which there were either indefinite suspensions, followed by resumption of work, or definite suspensions, similarly followed by resumption of work. None of the cases cited by the Government (except for Nicon, Inc. v. United States, 331 F.3d 878 (Fed.Cir. 2003)), which is discussed in Part III below, involve situations such as this one, where the "suspension" was ended by a planned, termination for convenience. See P.J. Dick, supra, 324 F.3d at 1368 (contract work completed 260 days after original contract completion date); Melka Marine, supra 187 F.3d at 1374 (contract work completed by date agreed to in agreed extension); C.B.C.

Enterprises, Inc., 978 F.2d 669, 670 (Fed Cir. 1992) (work completed 24 days after original contract completion date); Interstate General Government Contractors, supra, 12 F.3d at 1055 (work completed 459 days after anticipated date); All State, supra, 146 F.3d at 1370 (work completed 55 days after original deadline). The undersigned attorney, likewise, has not uncovered any Eichleay formula cases involving factual circumstances similar to this case – wherein the project was already half-completed at the time the suspension notice was issued, and the suspension was issued as a prelude not to delayed completion of the remaining work but rather to an eventual, planned, termination for convenience.

Under these circumstances, OAK would respectfully submit, the rationale for requiring proof of "standby" status disappears. The requirement of an indefinite suspension has its roots in the recognition that in the usual case, "the uncertainty of the duration of the suspension is the critical factor which causes the injury." All State Boiler, supra, 146 F.3d at 1998. In other words:

> Standby combined with an inability to take on additional work are the two prerequisites for application of the *Eichleay* formula, because taken together they prevent the contractor from mitigating unabsorbed overhead when it is incurred.

Interstate General Government Contractors, supra, 12 F.3d at 1057. Thus, the rationale for the currently established test

for determining Eichleay damage eligibility is all about whether or not the contractor is in a position to mitigate his overhead damages or not.

In the unique and previously unaddressed factual pattern of the instant case, however, it is clear that OAK was prevented from mitigating unabsorbed overhead regardless of whether it was on "standby" or not – for, because the Government acted as it did, OAK's bonding capacity was clearly kept on standby. Thus, irrespective of whether the Government actually believed in its own suspension order, the practical effects upon OAK were the same – i.e., OAK was prevented from mitigating its home office overhead losses as a result of the actions the Government took.

In Nicon, Inc. v. United States, 331 F.3d 878 (Fed.Cir.2003) – which will be discussed at greater length below – the Federal Circuit found that the Eichleay formula, developed as it has been in the context of work projects that were ultimately completed, albeit late, could *not* be reasonably applied to a situation where the government had never even issued a notice to proceed on the work, but had terminated the contract for its convenience before that point. Similarly, OAK would respectfully suggest that in the instant case, the Eichleay formula can reasonably be applied, but that whether or not OAK was technically on "standby" is irrelevant, given that

OAK was rendered helpless to mitigate its home office damages irrespective of that fact.

**III. ALTERNATIVELY, THE COURT MAY AWARD EQUITABLE ADJUSTMENT FOR UNABSORBED HOME OFFICE OVERHEAD UNDER A NON-EICHLEAY FORMULA UNDER NICON, INC. V. UNITED STATES, 331 F.3D 878 (2003).**

As previously alluded to, the Federal Circuit in Nicon, supra, has held that the Eichleay formula is not properly applied in situations where contract performance has never begun. Rejecting an argument made by the claimant which would have allowed substitution of the original contract price for the Eichleay "contract billings" term called for in the formula and the anticipated period of performance for the "actual days of performance" term, the Court decided instead that the Eichleay formula was simply not applicable to the situation that was presented in Nicon, 331 F.3d at 883-884. In the course of so deciding, the Court recognized that it had been said in previous cases that the Eichleay formula was the "only proper method of calculating unabsorbed home office overhead," but noted that "these statements must be read in light of the factual context in which they arose; they were all made in cases in which contract performance had started and had been interrupted by government delay. They are not applicable to a situation in which the contract is terminated before the commencement of performance." 331 F.3d at 884-885.

In an opinion narrowly tailored to the facts at issue in Nicon - wherein the contract terminated for convenience after a long delay prior to the issuance of a notice to proceed - the Court went on to hold that despite the inapplicability of Eichleay damages, *per se*, the contractor was nevertheless entitled to recover its unabsorbed home office overhead as part of the overall termination for convenience settlement, based on the equitable adjustment provisions of the applicable FAR provisions governing suspensions, changes, and terminations for convenience.

In the instant case, of course, since the contract was partially performed prior to the Government's termination for convenience, the factual situation rests somewhere in between the facts of Nicon, on the one hand, and the more usual cases cited previously in which the work is ultimately completed. OAK believes, and suggests to the Court, that in the present circumstance, the Eichleay formula may be generally followed with reasonable estimations based upon the partial performance which did take place - and giving due regard to the fact that it was the tying up of OAK's bonding capacity - with or without concomitant "standby" status that rendered OAK unable to mitigate its home office overhead damages. On the other hand, in the event that the Court believes the instant situation to be inappropriate for an Eichleay calculation, OAK, like Nicon,

should nevertheless be permitted to recover its home office overhead expenses for the same contractual reasons as obtained in Nicon.

The same FAR provisions held to apply in Nicon are similarly applicable in the case of OAK's contract with the Government, which incorporated by reference FAR 52.242-14 (Suspension of Work) (April 1984), 52.243-4 (Changes)(August 1987) and 52.249-2 (Termination for Convenience of the Government (Fixed Price)) (September 1996) and 52.249-2 Alt I (Termination for Convenience of the Government (Fixed-Price) - Alternate I (September 1996).

The Suspension of Work clause specifically provides, in pertinent part, as follows:

> (b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed or interrupted (1) by an act of the Contracting Officer in the administration of this contract, or (2) by the Contracting Officer’s failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the costs of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly . . . .

FAR 52.242-14(b). Similarly, the Changes clause provides that “[i]f any change under this clause causes an increase or decrease in the Contractor’s cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting

Officer shall make an equitable adjustment and modify the contract in writing." FAR 52.243-4(d). And finally, under the Termination for Convenience clause, FAR 52.249-2(g)(2)(i), OAK was entitled to recover "[t]he costs incurred in the performance of the work terminated, including initial costs and preparatory expense allocable thereto," - applying "[t]he cost principles and procedures of Part 31 of the Federal Acquisition Regulation, in effect on the date of this contract." See FAR 52.249-2(g)(2)(i), and FAR 52.249-2(i). See Contract, p. 10 (AR 10).

Accordingly, as in Nicon, OAK should be awarded its overhead so long as it is able to suggest a "reasonable method of allocating some portion of Nicon's unabsorbed overhead for the delay period" and so long as the other established requirements are met.[8] 331 F.3d at 887. The "delay period" began on May 2, 2003, when the suspension of work was ordered and continued until December 12, 2003 when the contract was

[8] Those requirements, per the Nicon opinion, are government-caused delay and standby. 331 F.3d at 887. As previously argued in Part II (A-B) above, those requirements have been met. As has also been previously argued, in Part II(C) above, the requirement that there be an "indefinite" suspension of work is largely irrelevant in this case to the determination as to whether OAK was prevented by Government action from acquiring replacement work during the delay. If the opinion in Nicon makes anything clear, it is that the Eichleay or similar requirements will *not* be applied in situations in which the facts render the stated requirements essentially meaningless.

terminated for convenience, was extended until at least February 13, 2004 when OAK completed the additional work related to the roof vents, and ultimately was not concluded until OAK's bonding was restored on or about May 17, 2004. By failing to respond to OAK's repeated requests for its bond to be released, or to be reduced, and by continuing to treat OAK as though it was on standby even after the contract was terminated for convenience, the government effectively denied OAK the opportunity to obtain new work and fund its continuing home office overhead expenses.

The Court is further requested to take judicial notice of the fact that even a termination for convenience often results in a real and measurable hardship to a small contractor. Any government contractor attempts to bid and perform work in a manner that enables it to maintain a comfortable backlog so that as projects are completed, others take their place. When a project is suddenly and prematurely terminated for convenience, a small contractor who has planned on spending four or five more months before completing a project is effectively "caught by surprise" and it may take many months for new work to be obtained. (This assumes, of course, the government actually releases the contractor's obligations under the bond at the time of the termination for convenience).

When a contract is suspended, however, and the bonding obligation is retained by the government for an extended period

of time, a small contractor with limited bonding capacity has no opportunity to seek other bonded work, or even interim work, and the lag time before new work can be sought and obtained is greatly increased. The contractor is at the mercy of the government until the suspension ends and billable work resumes, or until its bond is released through either completion or termination of the project.

The loss of revenue to offset OAK's home office overhead began on May 2, 2003, and continued not only until the time of the termination for convenience (December 12, 3003), but beyond. By failing to confirm the release or physically return the bond, or to even agree to reduce OAK's bonding obligation, as OAK had requested, and by requiring OAK to perform additional work even after the contract was terminated for convenience, the government caused OAK's surety to treat the bond as one that was still in place. The damages in the form of unabsorbed home office overhead in the amount of $344,395.92, as requested in the Complaint, accrued until on or about May 17, 2004. If the government had simply terminated the contract for convenience in the first place, on May 2, 2003, and had informed OAK's surety that the bond was released, OAK would have been able to seek new work almost one year earlier than May 17, 2004. While the government argues, in its brief, that the "contract effectively was ended through a suspension of work order" (Defendant's

Motion for Summary Judgment at p. 28), it fails to understand that a suspension does not, in fact, end or terminate a government contract. The government, most assuredly, did not advise OAK or its surety that the contract was ended and, to the contrary advised OAK that the suspension would last for one year. It was the financial harm that occurred during that additional year, when its bonding was obligated because of the indefinite and uncertain contract administration by the government, that the Plaintiff respectfully requests be redressed by this Court through the granting of summary judgment.

## CONCLUSION

For all of the foregoing reasons, the Plaintiff respectfully requests that the Court deny the Defendant's Motion for Summary Judgment and grant its Cross-Motion for Summary Judgment.

Respectfully submitted,

Dated: June 15, 2007

s/Michael H. Payne

Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Drive, Suite 100
Fort Washington, PA 19034
Tel: 215-542-2777
Fax: 215-542-2779
E-mail: mhp@phslegal.com

Attorney for Oak Environmental Consultants, Inc.

**CERTIFICATE OF FILING**

I hereby certify under penalty of perjury that on this 15th day of June 2007, a copy of the foregoing Memorandum In Support Of Plaintiff's Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment, the Appendix and the Affidavit of Eduard J. Eichen were filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Michael H. Payne