IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| OAK ENVIRONMENTAL CONSULTANTS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 06-113C (Judge Horn) |
| THE UNITED STATES OF AMERICA, | |
| Defendant. | |

**AFFIDAVIT OF EDUARD J. EICHEN**

1. I am the President of Oak Environmental Consultants, Inc. ("Oak"), I am personally acquainted with the facts stated herein, and I am fully authorized to make this declaration.

2. Oak, a small business 8(a) contractor, entered into a contract with the Department of the Navy to renovate family housing units at the Newport Naval Station, Newport, RI on September 30, 2002. The award price of the contract was $2,453,160.00. This was an important project for our small company and required the dedication of virtually all of our resources, and the application of most of our bonding capacity.

3. As part of its contractual obligations Oak submitted the required performance and payment bonds. Oak's bonding capacity, based on limitations imposed by its surety, was three million dollars. Accordingly, almost all of Oak's bonding

capacity was committed to this contract, and therefore limited Oak's ability to bid or obtain other federal work.

4. On May 2, 2003, after completion of approximately 50 percent of the project, the Navy ordered a suspension of Oak's work until May 1, 2004. I was advised that the reason for the suspension was because the Navy was considering the privatization of housing at the Newport Naval Station and, therefore, would possibly need to demolish the housing units that Oak was in the process of renovating.

5. During my subsequent discussions with Navy personnel at Newport, including the Contracting Officer, Denise Abraham, I was advised that the Navy might not actually privatize the housing, and that Oak might be directed to resume work. In fact, the Assistant Regional Officer in Charge of Construction later confirmed in a letter he wrote on our company's behalf, that ". . . it was thought that the privatization would not go through and the project could not be restarted at any time." He further stated that "Oak was asked to remain on standby and prepared to continue the work during this period in the event the project could be restarted." (AR, 125).

6. I was not advised that higher authority within the Navy, as early as April 2003, had already directed Navy personnel to close out our contract. I only learned of that fact when my attorney provided me with copies of documents

obtained during discovery in connection with this litigation. Accordingly, I am at a loss to explain, or understand, why the Navy suspended our contract for one year commencing on May 2, 2003, and continued to hold our bonds, while apparently knowing that they would not ever be directing us to resume work on the project.

7. The Navy subsequently asked Oak to provide a close-out proposal and I was led to believe that our contract would be terminated for the convenience of the government. Although the suspension of work order remained in place, we provided a termination for convenience close-out proposal on August 13, 2003.

8. When it became apparent to me that the Navy was planning to terminate our contract for convenience, I requested release of our bond so that Oak could seek other work. I made numerous requests to the Navy to release the bond, or to allow us to replace the bond with one that would reflect the value of unfinished work beginning in late May 2003. No responses to these requests were received as confirmed by the detailed letter I wrote to the Regional Officer in Charge of Construction on August 13, 2003 (AR 54), as well as two letters to the Contracting Officer dated September 30, 2003 and October 24, 2003, and my e-mail message to the Contracting Officer on November 5, 2003 (AR 59-63).

9. The Navy took no action in response to my requests that our bonds be released and refused to formally, or informally, advise our surety that our obligation to continue performance of the contract had been terminated.

10. When the Navy failed to release the bonds as I requested, I offered to substitute bonds in a lower amount to cover any potential warranty work, in the hope that this would free up most of Oak's bonding capacity so that our company could seek other work. The Navy did not accept this offer.

11. It was not until December 12, 2003, almost five moths after our work was suspended, that our contract was terminated for convenience, but even then the Navy did not release our bonds.

12. The Navy's failure and refusal to release our bonds caused our company to continue to incur home office overhead expenses without any opportunity to obtain other work to absorb those overhead expenses.

13. In fact, even after terminating our contract for convenience, the Navy continued to treat Oak as a company that was still under contract. As part of the project, Oak installed new boilers that were to be vented through new exhaust stacks in the existing roofs. During the course of performance of the renovations, Oak encountered severe winter weather. In order to avoid roofing work during this winter weather, the Navy directed

Oak to connect the new boilers to the existing exhaust stacks. Oak complied with this directive. After the contract was terminated for convenience, however, the Navy required Oak to perform additional work on the project involving the connection of new boilers in some of the previously renovated buildings to new exhaust vents.

14. Although the government has attempted to characterize our work on the exhaust stacks as the correction of a "safety deficiency," to the extent that there was a "deficiency" it was the result of a Navy directive. When we returned to correct this "deficiency," well after the contract had been terminated for convenience, we were paid for this work. It has been my experience that federal government agencies do not compensate contractors for the correction of deficient work.

15. Oak's bonding capacity was not restored until May 2004, and the Assistant Regional Officer in Charge of Construction later confirmed in the letter I mentioned above, that "Oak Environmental's bond was not released as it was thought that the privatization would not go through and the project could be restarted at any time." He further stated that "Oak and the ROICC office remained in regular contact during this time with regards to either restarting the work or releasing the bond. The bond was finally released on May 17, 2004 . . . ." (AR, 125).

16. It was only after our bonds were finally released on May 17, 2004, that our company had the opportunity to use its bonding capacity to seek other work. Costs related to the termination for convenience were subsequently negotiated and were embodied in a contract modification issued on August 3, 2005. (AR, 37-38). The modification specifically allowed Oak to "reserve its right to file a request for equitable adjustment, or a claim, for home office overhead pursuant to the Eichleay formula." (AR 38).

17. Although Oak requested extended home office overhead costs measured from the date of the suspension of work order, May 2, 2003, to the date when the bonds were released, May 17, 2004, the Navy has refused to compensate us in any way for those incurred costs.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: 15 June, 2007

Eduard J. Eichen