No. 06-113C
(Judge Horn)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

OAK ENVIRONMENTAL CONSULTANTS, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S REPLY IN SUPPORT OF THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

STEVEN G. GILLINGHAM
Assistant Director

RICHARD P. SCHROEDER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

July 9, 2006

Attorneys For Defendant

# TABLE OF CONTENTS

PAGE(S)

INTRODUCTION ..................................................................................................... 2

STATEMENT OF THE FACTS ..................................................................................... 3

ARGUMENT ........................................................................................................... 3

I. OAK Cannot Satisfy The Elements Required For Eichleay Damages ................ 3

A. OAK Cannot Demonstrate That The Government Caused A Delay Of Uncertain Duration ..................................................................... 4

1. The Suspension Was Expressly Authorized By The Contract And Was For A Definite Period .................................... 4

2. The Suspension For A Definite Period Precludes OAK's Claim For Eichleay Damages ..................................................... 5

3. OAK Has Failed To Demonstrate That The Definite Suspension Actually Was Indefinite ............................................ 6

B. OAK Cannot Satisfy The Second Element Of The Eichleay Test – That A Government-Caused Delay Extended The Original Time For Performance ............................................................... 10

C. OAK Cannot Establish The Third Element Of Eichleay – That The Contractor Must Be On Standby And Unable To Take On Other Work During The Delay Period ........... 14

D. OAK's Attempt To Rewrite Eichleay Should Be Rejected .................... 19

II. Oak's Alternative Claim For An Equitable Adjustment For Unabsorbed Home Office Overhead Should Be Rejected ..................................................... 20

CONCLUSION ...................................................................................................... 22

## TABLE OF AUTHORITIES

CASES PAGE(S)

Avtel Services, Inc. v. United States,
40 Fed. Cl. 173 (2006) ........ 7

Capital Electric Co. v. United States,
729 F.2d 743 (Fed. Cir. 1984) ........ 16

Crowley v. United States,
398 F.3d 1329 (Fed. Cir. 2005) ........ 20

Fireman's Fund Ins. Co. v. United States,
909 F.2d 495 (Fed. Cir. 1990) ........ 6

Interstate General Government Contractors, Inc. v. West,
12 F.3d 1053 (Fed. Cir. 1993) ........ 14, 16

Melka Marine, Inc. v. United States,
187 F.3d 1370 (Fed. Cir. 1999) ........ 5, 14, 18

Nicon, Inc. v. United States,
331 F.3d 878 (Fed. Cir. 2003) ........ passim

P.J. Dick, Inc. v. Principi,
324 F.3d 1364 (Fed. Cir. 2003) ........ 5

Night Vision Corp. v. United States,
469 F.3d 1369 (Fed. Cir. 2006) ........ 6

West v. All State Boiler, Inc.,
146 F.3d 1368 (Fed. Cir. 1998) ........ 5, 9, 10

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| OAK ENVIRONMENTAL CONSULTANTS, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-113C (Judge Horn) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, defendant, the United States, respectfully submits this reply in support of the Government's motion for summary judgment and opposition to plaintiff's cross-motion for summary judgment (the "cross-motion"). We rely upon the complaint of plaintiff, Oak Environmental Consultants, Inc. ("OAK"), the parties' September 22, 2006 joint stipulations of fact, the supplemental joint stipulations of fact filed June 1, 2007, the joint appendix, the additional appendix filed by plaintiff in support of its cross-motion, and the supplemental appendix attached to this brief.[1] For the reasons set forth below and in our opening brief, the Court should grant summary judgment in favor of the Government and deny plaintiff's cross-motion.

[1] The complaint is cited "Comp. __, ¶ __." The joint stipulations of fact is cited "Jt. Facts __, ¶ __." The supplemental joint stipulations of fact is cited "Supp. Jt. Facts __, ¶ __. The joint appendix is cited "A__," and includes the appendix annexed to the supplemental joint stipulations of fact. References are to page and, where indicated, paragraph numbers. Our opening brief is cited "Def. Mot. __." Plaintiff's cross-motion is cited "Cross-Mot. __." The affidavit of Eduard Eichen is cited "Eichen Aff. __, ¶ __." The transcripts in the separate appendix to plaintiff's cross-motion are cited in the following format: Zanoli Dep. at __, lines __-__. The supplemental appendix attached to this brief is cited "SA__."

# INTRODUCTION

OAK claims that it is entitled to an equitable adjustment arising from the Navy's termination of its contract for convenience. Comp. 5-6, ¶¶ 23-25 (Count I). OAK also asserts that it is entitled to breach of contract damages, because the Navy allegedly: (1) issued a suspension of work order, when it had no basis to anticipate that work would resume after the suspension; (2) failed to "release" OAK's bond after OAK's contract was terminated; (3) required OAK to continue contract performance after the contract was terminated; and (4) "effectively" continued the suspension of work for an indefinite period following the termination. Comp. 6-7, ¶¶ 26-31 (Count II).

In our opening brief, we demonstrated that we are entitled to summary judgment upon OAK's claims. In response to our motion, OAK unconvincingly asserts, among other things, that, although the Government suspended OAK's contract for a definite period of time, its suspension should be treated as indefinite (Cross-Mot. 6); that OAK "effectively" was "forced" into a standby mode by the Government's alleged actions; (Cross-Mot. 7); that OAK was expected to resume work immediately if needed (Cross-Mot. 10); and that OAK was precluded from seeking work because the Government allegedly "tie[d] up" its bonding capacity (Cross-Mot. 11).

OAK's cross-motion essentially is an attempt to rewrite history. The undisputed facts, however, demonstrate that the Government did exactly what it said it was doing. First, the Government suspended OAK's contract for a <u>definite</u> period of time – one year. The Government's action in that regard was lawful and consistent with the contract. Further, OAK was not placed on standby, as it claims. In addition, the status of OAK's bonding capacity was a

matter between OAK and the surety, and if OAK was dissatisfied with its surety, it should have pursued a claim against the surety.

Finally, OAK primarily argues that it is entitled to Eichleay damages. In the alternative, it requests damages for unabsorbed home office overhead under a non-Eichleay formula. OAK is not entitled to either measure of relief.

Accordingly, the Court should grant summary judgment in the Government's favor and deny OAK's cross-motion.

## STATEMENT OF THE FACTS

The relevant facts are set forth at length in the parties' joint stipulation of facts, supplemental statement of facts, and the Government's opening brief.

## ARGUMENT

### I. OAK Cannot Satisfy The Elements Required For Eichleay Damages

The primary relief OAK seeks are Eichleay damages. As set forth in our opening brief, use of the Eichleay formula is an extraordinary remedy and the contractor must meet certain strict prerequisites for its application. Nicon, Inc. v. United States, 331 F.3d 878 (Fed. Cir. 2003) 883-884.

To summarize: "First there must have been a government-caused delay of uncertain duration." Id. Second, the contractor "must . . . show that the delay extended the original time for performance or that, even though the contract was finished within the required time period, the contractor incurred additional costs because he had planned to finish earlier." Nicon, 331 F.3d at 883. Third, "the contractor must have been on standby and unable to take on other work during the delay period." Nicon, 331 F.3d at 883. Failure to meet any one of these elements is

sufficient to dismiss the claim for Eichleay damages. OAK fails to satisfy any of the above elements. Therefore, OAK is not entitled to Eichleay damages.

### A. OAK Cannot Demonstrate That The Government Caused A Delay Of Uncertain Duration

#### 1. The Suspension Was Expressly Authorized By The Contract And Was For A Definite Period

OAK's contract permitted the contracting officer to "suspend, delay, or interrupt all or any part of the work," in writing, for a reasonable time period that the contracting officer determined to be appropriate for the Government's convenience. Jt. Facts 3, ¶ 9; A49-50. This is exactly what the contracting officer did.

Specifically, on May 2, 2003, the contracting officer sent OAK a letter suspending contract performance "immediately through May 1, 2004." Jt. Facts 3-4, ¶ 10; A4. The contracting officer directed OAK to stop all on-site work "except that which is necessary to correct . . . safety deficiencies; prevent damage to existing government property, and secure existing housing units and project materials." Id. The Navy also requested OAK to provide a proposal for the deletion of all remaining work under the contract. Id.

The Navy took this action due to a pending privatization of base housing, which the Navy anticipated would involve demolishing the exiting housing and building new housing, thus ending the need for repairs to the existing housing. Jt. Facts 4, ¶ 11; A52. OAK does not dispute this and, in fact, acknowledges that it was advised that the proposed privatization was the reason for the suspension. Eichen Aff. 2, ¶ 4.

### 2. The Suspension For A Definite Period Precludes OAK's Claim For Eichley Damages

Where a contractor knows with certainty that it cannot be called upon to perform work during a specific time-period, the contractor is not on standby; standby requires an uncertain delay period during which the Government can require the contractor to resume full-scale work at any time. P.J. Dick, Inc. v. Principi, 324 F. 3d 1364, 1371 (Fed. Cir. 2003) (contractor must show that the Government-caused delay was not only substantial but was for an indefinite duration; for example, where Government suspends all work, but tells the contractor that work will begin again on a date certain, the contractor cannot be on standby); Melka Marine, Inc. v. United States, 187 F.3d 1370, 1376 (Fed. Cir. 1999); West v. All State Boiler, Inc., 146 F.3d 1368, 1380 (Fed. Cir. 1998) (where Government suspends work on a contract for a predetermined, definite period, the contractor is not on standby during the suspension);.

Further, the Government can avoid liability for unabsorbed overhead expenses in the future by not keeping the contractor on standby during the suspension. All State Boiler, Inc., 146 F.3d at 1380. As stated in Melka, 187 F.3d 1380, if the Government "so values quick start-up and early completion once the suspension of work is lifted, then it will order indefinite standby, knowing of the possible liability."

Thus, the Government had a choice to either suspend OAK's contract for a definite time, and avoid liability for unabsorbed overhead expenses, or to suspend OAK for an indefinite period of time, and risk liability. The Government chose the former course of action. This precludes the recovery of Eichleay damages.

**3. OAK Has Failed To Demonstrate That The Definite Suspension Actually Was Indefinite**

It would have been a waste of Government resources to have OAK continue to perform services upon housing that was being considered for demolition. The suspension allowed the Navy to close out the contract in an orderly fashion and avoid such waste of resources. The arguments that OAK raises in an attempt to discredit the Navy's decision to suspend the contract are without merit. Further, OAK's attempt to provide a basis for liability (arguing that, what clearly was a definite suspension of one year actually was an indefinite suspension) is equally without merit.

OAK complains that the May 1, 2004 end date of the suspension was "arbitrarily selected to give the government one year to terminate the contract for convenience, something that could have, and should have, been done on May 2, 2003." Cross-Mot. 18. OAK is second-guessing the contracting officer's decision upon how to best administer the contract. This is inappropriate. See Night Vision Corp. v. United States, 469 F.3d 1369, 1375 (Fed. Cir. 2006) ("[T]he contracting officer has broad discretion to . . . administer contracts."); Fireman's Fund Ins. Co. v. United States, 909 F.2d 495, 496-498 (Fed. Cir. 1990) (reversing trial court's holding that Army's release of retainage to address contractor's cash flow problems prejudiced surety and, therefore, discharged surety from its obligations; although, "ideally," Government should hold retainage until work substantially complete, Government has considerable leeway in administering contract, and public policy supports flexibility in light of unforeseen circumstances that may hinder performance).

Accordingly, OAK's assertion that the contract "could have, and should have, been [terminated] on May 2, 2003," is immaterial. See Cross-Mot. 18. The Government decided to

first suspend, then terminate. As previously noted, it had the contractual right to proceed in that manner. The fact OAK claims it would have proceeded in a different manner had it been in the agency's position does not provide grounds for relief. Cf. Avtel Services, Inc. v. United States, 70 Fed. Cl. 173, 190 (2006) (holding, in bid protest, that Court must not substitute own judgment for that of agency or contracting officer where decision founded upon reasonable basis, even if reasonable minds could differ).

Here, the Navy acted more than reasonably in closing out OAK's contract. The suspension, which was expressly authorized by the contract, and eventual termination, did not arise in a vacuum. Following the suspension, the parties worked for months to bring the contract to a conclusion. OAK was as much engaged in the process as the Navy. Further, although the parties were unable to resolve the Eichleay issue, they did resolve a number of other issues, as the chronology below demonstrates.

The relevant events began to unfold on April 24, 2003, when the Resident Officer In Charge Of Construction ("ROICC") at the Naval Station, Newport, Rhode Island, advised his staff that he had been notified by the Commander, Atlantic Fleet, to stop OAK's work because the Navy was "looking to have all of the Anchorage Housing demolished." Supp. Jt. Facts 1, ¶ 49; A131. Work was verbally stopped that same day. Id. at 1, ¶ 50; A131. The Navy's goal was "to reduce the inconvenience of the stoppage to OAK as soon as possible." Id. A131.

As of April 29, 2003, the status of the privatization was still uncertain and the situation was still evolving. See id. at 2, ¶ 52. On May 2, 2003, the Navy confirmed to OAK in writing that performance was suspended and requested that OAK provide a closeout proposal. Jt. Facts 3-4, ¶ 10, A51. On May 27, 2003, the privatization was confirmed, and on June 2, 2003, the

ROICC received a formal request from the Navy to terminate OAK's contract. Supp. Jt. Facts at 2, ¶ 53, A136.

However, there were still issues regarding how to best accomplish this. The Navy initially determined that a bilateral modification should be attempted. Id. at 2, ¶ 55, A137. Although the Navy had requested that OAK provide a close out proposal two months earlier, it was not forthcoming. Therefore, on July 7, 2003, the Navy again requested that OAK provide a close out proposal. Jt. Facts 4, ¶ 13; A59. OAK did not object, in principle, to complying with the Navy's request, and indicated that it still was in the process of completing the proposal. Id. at 5, ¶ 14; A59. OAK submitted its proposal on August 13, 2003, which included, among other things, a request for Eichleay damages. Id. at 5, ¶¶ 15-16; A54-57.

For the next several months, the parties engaged in discussions of numerous issues, including the correction of boiler safety and OAK's requests for additional funds. Jt. Facts 5-9, ¶¶ 19-36. The Navy terminated OAK's contract for convenience on December 12, 2003. Jt. Facts 9, ¶ 37; A31-36. Following the termination, from December 19 through December 23, 2003, and from February 9 through February 13, 2004, OAK performed the boiler work. Id. at 8, ¶ 31. Eventually, the parties entered into a modification settling the issue of the amount due to OAK, apart from Eichleay damages. Jt. Facts 10, ¶¶ 41-43.

In light of the circumstances, the Government acted more than reasonably when it suspended the contract for one year. Although the parties did not use up the entire period of the suspension before terminating OAK's contract, they did spend more than seven months of the suspension period attempting to resolve outstanding contract issues. Further, notwithstanding OAK's criticism of the suspension, OAK took more than three months to provide a close out

proposal and failed to correct the deficient boiler connections until after the contract was terminated.

Although it took less than a year to close out the contract, this does not invalidate the suspension. Further, OAK received the benefit of the suspension. OAK was free to move onto other projects and had no obligation to remain mobilized. As previously noted, "[b]y fixing, at the outset of the suspension period, a future date on which the contractor will be expected to return to work . . . the government . . . avoids liability for unabsorbed overhead expenses in the future. All State Boiler, Inc., 146 F.3d at 1380. And by doing so, it afforded OAK the opportunity to employ its services elsewhere.

Certainly, not only is it reasonable for a contracting officer to seek to avoid subjecting the Government to unnecessary liability, it is part of the contracting officer's role to do so. The fact that OAK may have unreasonably concluded that a suspension that unequivocally stated it was for a period certain was somehow indefinite is something for which the Government cannot be held responsible.

When the Government suspends a contract for a period certain – for example, a year – it has the right to assume that it will be taken at its word. Further, given that OAK was advised that the suspension was due to the pending housing privatization, it had no reasons to conclude that it would be called back to work during the suspension period. Essentially, OAK had it in writing that the contract was suspended for a year. It was asked on more than one occasion to submit a close out proposal, which it eventually did. To the extent that OAK claims that it did not believe it could reply upon Government's written suspension of the contract, either OAK's assertion is false or its belief was irrational. Under either scenario, OAK is not entitled to the relief it seeks.

In sum, the duration for the suspension was stated clearly and unambiguously. There could have been no clearer statement of duration than found in the Navy's notice to OAK. OAK, upon receiving the suspension notice, had the right to anticipate that it would not be required to perform work upon the contract until May 01, 2004, except for corrective work, and to plan accordingly.

**B. Oak Cannot Satisfy The Second Element Of The Eichleay Test – That A Government-Caused Delay Extended The Original Time For Performance**

In our opening brief, we demonstrated that OAK cannot satisfy the second element of the Eichleay test – that a Government-caused delay extended the original time of performance. We do not repeat our entire argument here. Rather, we will briefly summarize our argument and then address the issues raised by OAK in its cross-motion.

By way of summary, the Federal Circuit, in Nicon, 331 F.3d at 884, addressed a situation in which, due to a bid protest, a contractor was suspended from taking action under the contract and never received a notice to proceed. The contract was terminated prior to any work taking place. Id. The contractor requested Eichleay damages. Id. The court held that Eichleay "is not intended to simply compensate for any government-caused delay; rather, Eichleay damages are only available when the delay causes contract performance to require more time than originally anticipated." Id.; see also All State Boiler, 146 F. 3d at 1378.

We demonstrated that here, there was no extension of contract performance, because the contract effectively was ended through a suspension of work order, which was issued before the contract completion date of September 30, 2003. In response, OAK claims that our argument is at odds with our assertion that the suspension was for a definite period of time. Cross-Mot. 16. OAK assets that either the Government considers valid the suspension, "in which the contract

completion date was clearly extended by the one year suspension until May 1, 2004," or else the Government agrees that the suspension was "meant" to be indefinite and contemplated an earlier termination. See Cross-Mot. 17.

First, OAK's argument misstates the standard for Eichleay damages. "Eichleay damages are only available when the delay causes contract performance to require more time than originally anticipated." Nicon, 331 F.3d at 884. OAK subtly attempts to change this standard.

For instance, OAK asserts that, if the Government considers the suspension of work notice valid, then "the contract completion date was clearly extended by the one year." Cross-Mot. at 17. OAK is attempting to divert attention from the requirement that there be an extension of performance. However, the issue in Eichleay is not whether the formal contract completion date changed. Rather, it is whether, in fact, the contractor was compelled to perform work on the project for a longer period of time, leading to higher overhead costs. Here, even though, in theory, the suspension could have caused an extension in the contract completion date, because the work was terminated, there was no extension in fact.

Second, OAK improperly attempts to invalidate the Navy's definite suspension by looking backward, noting that the contract was terminated before the suspension period was complete, and arguing that this somehow makes the extension an indefinite one. However, a suspension for a year, even if, as OAK asserts, the Government "contemplated" an earlier termination, is not rendered indefinite simply because the contract was terminated before the expiration of the suspension. Although the termination rendered the suspension moot, it did not make it any less definite. Further, under such circumstances, the underlying policy has been served. Specifically, upon receiving the one year suspension letter, OAK was entitled to demobilize and no longer be concerned about performing the contract work for a year. Further,

in the highly unlikely event that OAK was called back to service, the Government, not OAK, would bear the costs of any extra costs incurred by OAK.

Third, OAK finds it of great significance that the ROICC testified that he could not remember how he came up with May 1, 2004 as the date through which the contract was suspended. Cross-Mot. 18. For one thing, it is obvious that May 1, 2004 was selected because the suspension letter was issued May 2, 2003. Therefore, the suspension was for a definite duration of exactly one year. Although OAK infers from the ROICC's testimony that the one-year period was arbitrary, this argument is a red herring. The Navy was faced with a pending privatization of base housing. A suspension clearly was appropriate, first to ensure that the privatization actually was going to go through, and second, to provide the parties with a reasonable opportunity to close out the contract. The ROICC suspended the contract for one year, which was a reasonable exercise of his discretion. Although OAK implies that some great degree of mathematical precision was required in determining how long to make the suspension, it has failed to demonstrate that the Navy acted unreasonably.

Fourth, OAK relies upon the boiler connection work to support its Eichleay claim. We already have addressed that argument at length in our summary judgment motion. To summarize, OAK performed the boiler work for approximately eight days to correct a safety deficiency. See Jt. Facts 8, ¶ 31. However, OAK cannot prosecute an Eichleay claim based upon that work because the corrective work was never suspended, and because the delay with respect to the corrective work was not the Navy's fault. Nicon, 331 F.3d at 883 ("[T]here must have been a government-caused delay of uncertain duration.") (emphasis added).

Further, we demonstrated in our opening brief that OAK merely was correcting its own work. In response, OAK states that the new six inch exhaust stacks were temporarily connected to two existing four inch stacks at the Government's direction because snow and other winter weather conditions prevented the new stacks from being independently vented. Cross-Mot. 19. OAK claims that this somehow proves that the corrective work constituted a Government caused delay. OAK's conclusion is unfounded.

As an initial matter, the work was required to correct a safety deficiency. Further, we pointed out in our opening brief that, although OAK did not correct that deficiency until the following winter, i.e., the winter of 2003/2004, OAK cannot demonstrate that the Navy prevented it from performing the corrective work before the contract was suspended. See Def. Mot. 29.

In other words, had OAK corrected its own work in a timely manner – for example, during April 2003 – it would not have found itself making the correction after the contract was suspended. OAK simply has ignored that argument. Further, had OAK performed the original work in a proper and timely manner – i.e., prior to the onset of winter conditions that originally precluded roof work and repair of penetrations (see Jt. Facts 6 at ¶ 20), it would not have found itself in the position of making temporary repairs. The Government is not responsible for these delays.

OAK also asserts that payment by the Government for the corrective work conclusively establishes that OAK was not responsible for the work. Cross-Mot. 20. However, regardless of whether OAK was paid for the work, the record establishes that the work was performed to correct a safety deficiency. Since OAK installed the work in a manner that created a safety

hazard, it was OAK's responsibility to fix it, regardless of whether the contract was suspended. OAK simply has failed to demonstrate that its installation of the boiler connections in an unsafe configuration was permitted by the contract or intended by the parties when they entered into the contract.

### C. OAK Cannot Establish The Third Element Of Eichleay – That The Contractor Must Be On Standby And Unable To Take On Other Work During The Delay Period

To successfully prosecute a claim for Eichleay damages, a contractor must have been on standby and unable to take on other work during the delay period. Nicon, 331 F.3d at 883 (citing Interstate General Government Contractors, Inc. v. West, 12 F.3d 1053, 1056-57 (Fed. Cir. 1993)). As we established in our opening brief, there are two separate prongs of the third element: standby and inability to take on other work. Id. As noted previously, we do not address the latter, absent any applicable evidence in the joint stipulations of fact; however, it is clear that OAK cannot satisfy the standby requirement. Under the Eichleay formula, "standby" requires an uncertain delay during which the Government "can require the contractor to resume full-scale work at any time." Melka, 187 F.2d at 1376. OAK does not dispute this. Indeed, OAK expressly states that a "contractor claiming Eichleay damages must prove," among other things, "that it was required to resume work on the contract immediately and at full speed." Cross-Mot. 20.

First, there is an absence of contemporaneous records that demonstrate that OAK was on standby. Further, OAK cannot seriously argue that it was required to remain poised to immediately go back to work. Indeed, the work was suspended because the Navy was planning to privatize base housing. This was not kept secret or hidden from OAK. To fill its evidentiary

void, OAK resorts to mere argumentation ("OAK contends . . . that [it] in fact was expected to remain on standby for the Government's convenience throughout the entire period up until May of 2004.") Cross-Mot. 21.

Second, OAK claims that the Government "prevented OAK's bond from being discharged." However, the bonds were executed by OAK and its surety, Lincoln General Insurance Co. A42-46. The Navy did not execute the bonds. Further, OAK cannot establish a duty by the Navy to "release" its bond or a breach of such duty. Indeed, the Navy was within its rights to suspend for a year. Thus, whether OAK should have been released from its bond or should have been bonded for other projects, was a matter between OAK and its bonding company and not between OAK and the Navy.

Indeed, as we pointed out in our opening brief, in its claim to the contracting officer, OAK asserted that the Navy's supposed failure to "release" its bond caused its bonding company to lose confidence in OAK, which, allegedly, effectively precluded its ability to extend its bonding line. A127-128. OAK claimed that this was because the bonding company "was concerned that at least some of the reason the project was suspended" may have been due to some fault regarding OAK's work and that the bonding company continued to lack confidence in OAK even after the bond was "released." Id. However, the reasons for the suspension were well known and were not based upon performance issues. Further, the suspension notice itself referenced FAR 52.214-14 (permitting suspension of work for convenience of the Government). A51. Thus, the notice, by its reference to FAR 52.214-14, established that performance was not the reason for the suspension. Certainly, a company that issues bonds of Federal contracts should be familiar with the FAR.

The Government is not liable if other parties unreasonably misinterpret the grounds for a suspension. Nor is the Government responsible for the fact that the bonding company may not have trusted OAK. If OAK was treated unfairly by its bonding company, OAK should have taken action against it. Indeed, OAK has not even documented the steps that it took to convince the bonding company to discharge the bond.

Third, to the extent OAK alleges its bonding difficulty forced it to remain on standby, OAK has not established that that was the case.

Fourth, the cases relied upon by OAK do not provide support for its position. In Capital Electric Co. v. United States, 729 F.2d 743, 744 (Fed. Cir. 1984), the parties stipulated that there were "303 days of compensable delay due to the fault of the Government," where, in the present case, no compensable delay has been demonstrated. Similarly, in Mech-Con Corp. v. West, 61 F.3d 883, 884-885, 887 (Fed. Cir. 1995), the parties stipulated, among other things, that there had been an unexpected 289-day delay and that Mech-Con had to "stand ready" to perform; further, the court implicitly held that the delay was caused by the Government. Here, OAK has failed to prove those elements of Eichleay damages. Finally, in Interstate General, 12 F.3d at 1058, the court found that the board of contract appeals could support a claim that the contractor was required to remain on standby during a bid protest and that it was undisputed that "the government alone caused the delay." Again, these factors are not present with respect to OAK.

Fifth, OAK's speculation, that its bonds allegedly were not released because Navy representative harbored hope that the privatization order might be rescinded, provides OAK with no basis for relief. See Cross-Mot. 23. OAK bases this claim on its allegation that its president

"alluded to having heard something like this might be happening." Cross-Mot. 24. Such vague allegations are insufficient to overcome our motion for summary judgment.

Similarly, OAK's reliance upon a June 22, 2005 letter signed by a former Government employee, Nolan Redding, also is misplaced. See Cross-Mot. 24; A125. That letter was written more than three years after the suspension was issued. In addition, the letter is not supported by any contemporaneous evidence. Finally, Mr. Redding indicated during his deposition that the letter, including the language regarding standby, was prepared by OAK. Redding Depo. at p. 57, lines 18-24 through p. 58, lines 1-7, and p. 59, lines 6-11. SA2.

Further, Mr. Redding testified that his understanding of the term standby, as used in the letter, referred to the saftey concerns and boiler issue. Id. at p. 59, lines 6-17, SA2. Further, the letter was to be used to provide general information to OAK's bonding company, not as support for OAK's Eichleay claim. A126. In addition, Mr. Redding expressly indicated that he had no basis for concluding that the project might be resumed, although anything was possible. Redding Depo. at p. 62, lines 7-18, SA3. Further, with respect to the statement in the June 22, 2005 letter regarding the "release" of the bond, Mr. Redding testified that he does not know what the phase means and that it was written by OAK. Id. at p. 64, lines 10-23, p. 65, lines 18-21, and p. 66, lines 1-9, SA4.

Based upon the above statements, it is clear that the June 22, 2005 letter was presented to Mr. Redding for one purpose but used for another; that the statements in the letter, including the term standby, were taken out of context; that Mr. Redding does not know what the phrase "release of the bond" means; and that he had no basis to conclude that work might realistically be restarted. Indeed, as far as Mr. Redding knew, the only purpose of the letter was to tell the

new bonding company that OAK's performance had been satisfactory. Redding Depo. at 67, lines 5-15, A4.

Sixth, OAK's reliance upon the boiler work in support of its standby argument cannot withstand scrutiny. See Cross-Mot. 25. According to OAK's daily reports, 32 hours of work were performed each day from December 19 through December 22, 2003; eight hours of work were performed on December 23, 2003; 16 hours were performed on February 9, 2004; 32 hours were performed on February 10; 16 hours were performed on Feb 11; 32 hours were performed on February 12; and 19 hours were performed on February 13. A65-75. Further, although the Navy requested on October 22, 2003, that the corrective work be performed by November 28, 2003, OAK did not comply. In light of these facts, OAK cannot reasonably assert that there was a large crew of laborers and carpenters ready to be deployed at a moment's notice. Indeed, it took two months for OAK to begin the work. Nor has OAK presented any contemporaneous records showing that it actually was on standby. Indeed, the corrective work was insignificant in proportion to the value of the overall contract and, therefore, does not demonstrate that OAK was requested to perform "full scale" work. Melka, 187 F.2d at 1376.

Finally, OAK's claim that the ROICC issued the suspension in clear contradiction of the directive from higher up that the contract be closed out also is misplaced. See Cross-Mot. 26-27. It was up to the Navy personnel at the site to interpret what the directive meant. They chose to proceed with a suspension. The fact that OAK believes this somehow was contrary to the directive is irrelevant. Further, assuming, for the sake of argument, that OAK's interpretation is correct, it has failed to show that this invalidated the actions that were taken by the authorized contracting officials.

## D. OAK's Attempt To Rewrite Eichleay Should Be Rejected

OAK asserts, in the alternative, that the Court should disregard the standby requirement for Eichleay damages. In other words, OAK is asking this Court to ignore precedent and create a more liberal rule for recovery of Eichleay damages. The Court should reject OAK's request. Cross-Mot. 31-32.

As an initial matter, OAK's request underscores the lack of contemporaneous evidence that it was on standby. Further, OAK's assertion that the Eichleay doctrine was developed in cases of suspensions followed by a resumption of work, rather than cases of suspensions followed by a termination, is not surprising. See Cross-Mot. 32-33. The reason is obvious. In situations such as this, where performance was suspended until contract termination, there is no basis for granting Eichleay damages. This further underscores the weakness of OAK's position.

Similarly, OAK's assertion that the rationale for requiring standby status "disappears" in the present circumstances also is unfounded. See Cross-Mot. 33. Essentially, OAK's argument is based upon one factor, its unsupported allegation that the loss of bonding capacity prevented it from "mitigating its home office overhead losses." Cross-Mot. 34. However, as noted, OAK has shown no basis for the Government's liability for this fanciful claim of what amounts to a claim of tortious interference.[2]

---

[2] Indeed, if OAK's claim is not an Eichleay claim, it has been released. Specifically, pursuant to Modification No. 4, OAK agreed to accept $326,659 "as a complete settlement for work performed and costs incurred by the contractor." A38. As a result of Modification No. 4, OAK released the Government from any and all liability for further equitable adjustments to the contract price or time related to the contract except for Eichleay damages. Id. Thus, if OAK's claim is not a genuine Eichleay claim, it has been released in exchange for a payment of more than $300,000.

Accordingly, if OAK is to claim extended overhead damages at all, it must do so pursuant to Eichleay. And, as previously noted, the elements of Eichleay must be demonstrated for a contractor to obtain Eichleay damages. "First there must have been a government-caused delay of uncertain duration." Id. Second, the contractor "must . . . show that the delay extended the original time for performance or that, even though the contract was finished within the required time period, the contractor incurred additional costs because he had planned to finish earlier." Nicon, 331 F.3d at 883 (citation omitted). Third, "the contractor must have been on standby and unable to take on other work during the delay period." Nicon, 331 F.3d at 883. Failure to meet any one of these elements is sufficient to dismiss the claim for Eichleay damages. OAK fails to satisfy any of the above elements. Those elements include demonstrating that the contractor was on standby. This is a matter of Federal Circuit precedent. Such precedent is binding upon this Court. Crowley v. United States, 398 F.3d 1329, 1335 (Fed. Cir. 2005). ("[T]he Court of Federal Claims may not deviate from the precedent of the United States Court of Appeals for the Federal Circuit any more than the Federal Circuit can deviate from the precedent of the United States Supreme Court. Trial courts are not free to make the law anew simply because they disagree with the precedential and authoritative analysis of a reviewing appellate court."). Accordingly, this Court should reject OAK's invitation to overturn binding precedent.

## II. OAK's Alternative Claim For An Equitable Adjustment For Unabsorbed Home Office Overhead Should Be Rejected

In the alternative, OAK suggest that the Court should grant it recovery of home office overhead under its contract, apart from Eichleay. OAK argues that the court in Nicon held that, despite the inapplicability of Eichleay damages, the contractor was nonetheless entitled to

recover unabsorbed home office overhead as part of the equitable adjustment provisions of the applicable FAR provisions governing suspensions, changes, and terminations for convenience. Cross-Mot. 36.

OAK's argument should be rejected for reasons stated in the immediately prior section of this brief. Specifically, as a result of Modification No. 4, OAK released the Government from any and all liability for further equitable adjustments to the contract price or time related to the contract except for Eichleay damages. A38. OAK cannot be permitted to induce the Government into paying it in excess of $300,000, in exchange for a release, then file a lawsuit against the Government based upon its released claims.

Moreover, even if OAK were not precluded by its release of the Government from pursuing non-Eichleay damages in this case, its claim should be denied upon the merits, for reasons discussed at length above and in our opening brief. See Def. Mot. 17-20. OAK simply has not demonstrated that the Government caused a delay to its performance or otherwise entitled it to unabsorbed overhead.

Similarly, OAK's asserts that, when a contract is terminated for convenience, a small contractor who has planned on spending four or five more months before completing a project is effectively "caught by surprise" and it may take many months for new work to be obtained. Cross-Mot. 39. This, in effect, is an admission that, even had the Government immediately terminated the contract, OAK likely would have had difficulty obtaining additional work for several months. In any event, OAK has released all non-Eichleay claims relating to this contract and, therefore, cannot recovery under its proposed alternative theory.

Finally, OAK concludes that the Government, "most assuredly, did not advise OAK or its surety that the contract was ended and, to the contrary advised OAK that the suspension would last for one year." Cross-Mot. 41. However, the Government provided OAK with a written suspension notice and other correspondence that spelled out the exact status of the contract. It was up to OAK to provide its surety with the documentation that the Government had provided to OAK. Whatever failures there were in that regard are the responsibility of OAK, not the Government.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court grant summary judgment in favor of the Government and dismiss the complaint, and that OAK's cross-motion be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

*s/Steven J. Gillingham*
STEVEN J. GILLINGHAM
Assistant Director

*s/Richard P. Schroeder*
RICHARD P. SCHROEDER
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
Eighth Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562

Attorneys for Defendant

July 9, 2007

CERTIFICATE OF FILING

I hereby certify under penalty of perjury that on this 9th day of July 2007, a copy of the foregoing "**DEFENDANT'S REPLY IN SUPPORT OF THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Richard P. Schroeder