No. 06-113C
(Judge Horn)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

OAK ENVIRONMENTAL CONSULTANTS, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S SUPPLEMENTAL APPENDIX

---

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

STEVEN G. GILLINGHAM
Assistant Director

RICHARD P. SCHROEDER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

July 9, 2007

Attorneys For Defendant

# INDEX TO DEFENDANT'S SUPPLEMENTAL APPENDIX

Nolan Redding Deposition Transcript Excerpts (March 8, 2007) . . . . . . . . . . . . . . . . . . . . . . SA1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No: 06-113C
Deposition

OAK ENVIRONMENTAL CONSULTANTS, INC.

vs.

THE UNITED STATES (JUDGE HORN)

DEPOSITION OF NOLAN REDDING, taken pursuant to the applicable provisions of the Rule of the United States Court of Federal Claims on behalf of the Plaintiff, before Salvina S. Ferreira, Certified and Registered Professional Reporter and a Notary Public in and for the State of Rhode Island, at Building One, Naval Station Newport, One Simonpietri Drive, Newport, RI, commencing at 9:20 A.M., on Thursday, March 8, 2007, pursuant to Notice and agreement of parties as to the date and time of taking said deposition.

. . . . .

LEDGEWOOD COURT REPORTING
23 Last Street
Tiverton, RI 02878
(401) 625-5455





I N D E X


| Examinations | Page |
|---|---|
| NOLAN REDDING | |
| Direct Examination By Mr. Payne | 4 |
| Cross Examination By Mr. Schroeder | 63 |
| Redirect Examination By Mr. Payne | 67 |


E X H I B I T S


| Exhibit No. | Description | Page |
|---|---|---|
| 1 | E-mail 9/16/03 | 30 |
| 2 | T4C Recommendation, 2 pages | 35 |
| 3 | NAV S3, 39 pages | 40 |






APPEARANCES: Michael H. Payne, Esq.
PAYNE, HACKENBRACHT & SULLIVAN
220 Commerce Drive, Suite 100
Fort Washington, PA 19034
Representing the Plaintiff

Richard Schroeder, Esq.
Department of Justice
Civil Division
1100 L St. N.W., Rm 4058
Washington, DC 20005
Representing The United States

ALSO PRESENT: Audrey Vandyke, Esq.





NOLAN REDDING, a witness called on behalf of the Plaintiff, having been duly sworn on oath, deposes and says as follows:

**Direct Examination By Mr. Payne:**

Q Mr. Redding, my name is Michael Payne. I am an attorney and I represent Oak Environmental Consultants, Inc. and I will be taking your deposition this morning.
Would you please state your name and business address for the record?
A **Nolan Redding -- home address or business?**
Q Whatever you're more comfortable with. Business is fine.
A **Home address is 11 Woodlawn Drive, Cranston, Rhode Island.**
Q Thank you.
And by whom are you currently employed?
A **Anderson Development Partners.**
Q Where are they located?
A **Detroit Michigan -- well, Wolverine Hills Michigan (sic) but near Detroit.**
Q What is your position with that company?
A **I'm a project manager.**

00:00:17 00:00:20 00:00:22 00:00:24 00:00:26 00:00:27 00:00:30 00:00:33 00:00:33 00:00:38 00:00:38 00:00:39 00:00:43 00:00:46 00:00:51 00:00:52 00:00:54





5A1

would have to consider whether that applies here and some of them I would look at and I would ask to see it and either I or you were aware of.
A Anything else in this package or?
Q We'll need that for some other people.
I'd like to show you a letter dated June 22nd, 2005. That is part of the joint document appendix that I referred to earlier and this is document number 125. And I just ask you to review this if you would Mr. Redding.
(Witness reading document)
A Okay.
Q Are you familiar with this letter?
A Yes.
Q Did you write it?
A Pieces of it.
Q Who else wrote it?
A Well, a little background. Bruce Newman from oak contacted me sometime in June. I don't remember the date. But he indicated to me that they were still having some trouble with their bonding company related to this project and would appreciate if a letter could be written to them indicating that they didn't have any -- there was no negative connotation





to the termination.
He had told me that the -- I believe that he said that the, you know, bonding company saw a termination in their past and it raised a red flag to them. So he sent me a draft letter that was e-mailed to me and I edited it and signed it and sent it to him.
Q When you signed this letter, did you believe at the time that there was anything in the letter that was not true?
A I would say subsequent to interpretation it was factual.
Q Well, did you think when you signed this letter that there was something that could be interpreted as not being true?
A Well, when I say that I mean that number one, this was not any kind of official letter that I could make because I no longer worked for the Government. He just indicated to me that if a letter was written, it would help their cause to help them get, you know, the bonding company satisfied.
So there was no context as far as, you know, the Eichleay Claim that he now put together. So that the items that I would say were up for





interpretation were things like remaining on, you know, stand by which, you know, if you interpret stand by to mean what it means in light of an Eichleay Claim it's a little different than the way I intended to present it to the bonding company.
Q Well, what did you mean with the words Oak was asked to remain on stand by?
A In my mind that the boiler stacks and the safety concerns were the main reason that was in there. I mean, that language was already provided for me when I got the letter from Bruce but I didn't see anything wrong with that at the time but now in light of an Eichleay Claim it seems to be, you know, and then you continue the sentence talking about that the entire project could be restarted. You know, in my mind I was thinking of still the boiler stacks.
I didn't think enough when I signed the letter about how it was worded. That's really the bottom line so.
Q But the statements themselves understanding that you may not have understood what use would be made of the letter, the statements themselves as far as you intended were true; is that correct?





A Well, if I read through this and I just take it line by line almost, I was honorably released, you know, I was -- the project was suspended. The comment about Navy's plan to privatize that wasn't really my authority to say that but they --
Q Why did you say it?
A Because that was the word around the office. You know, that was what we -- and as you seen from the documentation, that was what was kicked around the reasoning behind it.
Q And that happened to be true as it turns out, wasn't it?
A Right. So I'm saying that's not a false statement it's just not something that I, you know, officially could say to a, you know, but I did say it because I was trying to help them with their bonding company so.
Q Let me just interrupt you for a second. You didn't put this -- you didn't send this letter on an official basis, did you?
A No. It went to -- in fact, I was very surprised to see that it was submitted to the Government as an official document to support their claim and I was not happy about it. But that's what happened and

that's where we stand.

But other than that, you know, I mean the other items in here are factual it's just that there are some interpretations that should be used.

Q You got in some trouble for sending this letter, am I correct in saying that?

A I wouldn't say trouble but there was some, you know, question as to why I would write such a letter and -- yeah, I mean there was -- I wouldn't say any kind of trouble but that would be a, you know, there were questions of why I would write it, yes.

Q Okay. And I'm glad that you didn't get into any trouble.

Did the statement in the second paragraph in Oak's bond was not released as it was thought that the privatization would not go through and the project could be restarted at any time, is that a true statement?

A The part about their bond not being released as far as I knew at that time was true. Although, part of the reason I was questioned on the letter I should have made some phone calls to confirm some of this before I sent it out because at the time I wasn't positive that the -- I only took it on Bruce's word





that their bond hadn't been released. I didn't find out officially if it had been or not. So I allowed that to be in the letter. And as far as the privatization would not go through, you know, it did go through so, you know, at the time it wasn't -- I wasn't sure it would go through so.

Q Was it your understanding that if it did not go through, this project would be resumed?

A Well, it's feasible. I mean, anything is possible but there was no, you know, official direction from anyone to me that said that was the case.

Q You really didn't know one way or the other?

A I didn't know one way or the other. But the reasoning again the context of the letter was solely to assist them in releasing their bond not to, you know, state facts after the fact to try to regurgitate facts. I mean, it was just simply to help them out so to speak, you know.

Q When did you actually leave Newport?

A It was in August. Sometime in August of 2004.

Q 2004?

A Yes.

(Brief Pause)

MR. PAYNE: No further questions. Thank





you.

MR. SCHROEDER: I may ask a few. I just want to speak to him for a minute try to clarify a couple of things.

(Break taken)

(Back on the record)

MR. SCHROEDER: Just a few questions.

Cross Examination By Mr. Schroeder:

Q Do you recall testifying about the phrase devil's in the details?

A Earlier today, yes.

Q Yeah. And that was something that was written by Sue Lonigan?

A I think it was Kathy Finan.

Q Let's try to find that document.

That wasn't your phrase was it?

A No.

(Brief Pause)

A It was in Times New Roman font -- no, Courier. Sorry.

MR. PAYNE: Page 21.

MR. SCHROEDER: Thank you.

MR. PAYNE: Uh-huh.





A Oh, you're right. I'm sorry. It was Susan Lonigan.

Q And do you have any -- do you know what she meant by that phrase? Do you know what she subjectively meant by that phrase --

A No idea.

Q -- when she stated it?

A No idea.

Q She never explained to you what she meant by that?

A No.

Q Okay. Now, with respect to the phrase release the bond, do you know if there's an action of releasing the bond?

A I don't know of such -- I mean, I don't know what particular event would cause that to happen as far as you know, do we sit down in a room and sign something. I don't know.

Q Do you know if bonds are released in a Government contract?

A No.

Q Do you know whether the Government can release a bond in a Government contract?

A I don't. I guess maybe if I can explain what I -- no, I don't.

Q During your time with the Navy, did you ever witness

or do you know of any instance in which the Government released the bond?
A **No.**
Q Do you know who's -- now, as part of your duty with the Navy, did you have any responsibility regarding issues of contract bonds or bonding?
A **No.**
Q Who's normally responsible for that?
A **The contracting officer.**
Q Would you think that the contracting officer is in a better position than you are to discuss bonding issues?
A **Yes, yes. That's above my level of authority at the time so, yes, I would say the contracting officer.**
Q You recall the June 22nd, 2005 letter it's page 125 that you were looking at a few minutes ago?
A **Yes.**
Q And here it says release it refers to releasing the bond.
A **As I explained earlier my understanding of in theory of what that meant, I don't know.**
Q Well, actually I was going to ask you something different.
A **Oh, sorry.**





Q I was going to ask you who came up with that term in this letter?
Was that your term or was that a term given to you by the person who supplied you with a draft?
A **Well, most of the content was supplied by Bruce Newman. When I received the draft, I did make some changes to it, but I didn't change it substantially. So that term in particular was already there.**
Q And were you just writing this letter to be a nice guy to help these people out?
A **Yes.**
Q And when you use terms like stand by -- do you know what term of art is?
A **Well, I guess --**
Q How do you understand that term the term of art? What does that mean to you?
A **Something that someone in a certain profession may recognize to mean something in particular versus someone who's not necessarily in that profession may not know what it is.**
**I mean, like buttering a soap of masonry you're not going to know what that means but I know what that means because I'm around it all the time**

Ledgewood Court Reporting (401) 625-5455



**in the construction industry.**
Q So you have a statement here remain on stand by, was that intended to be a term of art or was that a generic use of that term?
A **Well, this entire letter was generic. The whole nature of it was just as I said before to give their bonding company a general statement that they weren't defaulted on this termination and that there was no -- like he says here their performance was satisfactory in all regards.**
**At the time of termination they were satisfactory. So that to me was the gist of the letter. Everything else was just, you know, in general just discussion and there was no meaning other than that of the letter.**
**I actually wrote a letter after this to try to explain that but I don't know if that's in the file or not.**
**MR. SCHROEDER: Nothing further.**

**Redirect Examination By Mr. Payne:**
Q Counsel for the Government asked you if you wrote this letter to be a nice guy and I believe you said yes.

Ledgewood Court Reporting (401) 625-5455



A **Yes.**
Q Were you so willing to be a nice guy that you would lie for them?
A **No. I'm not going to lie.**
Q Thank you.
MR. PAYNE: Nothing further.
(Whereupon the deposition ended at 11:57 a.m.)

Ledgewood Court Reporting (401) 625-5455