# In the United States Court of Federal Claims

**No. 06-113C**

**FILED: August 6, 2007**

| | |
|---|---|
| * * * * * * * * * * * * * * | |
| **OAK ENVIRONMENTAL CONSULTANTS, INC.,** | **Motion for Summary Judgment; Suspension of Performance; Definite or Indefinite Suspension; Termination for the Convenience of the Government; Eichleay Overhead Allocation.** |
| **Plaintiff,** | |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant.** | |
| * * * * * * * * * * * * * * | |

**Michael H. Payne**, Payne, Hackenbracht & Sullivan, Fort Washington, Pennsylvania, for the plaintiff.

**Richard P. Schroeder**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With him were **Peter D. Kiesler**, Assistant Attorney General, and **Steven G. Gillingham**, Assistant Director, Commercial Litigation Branch.

## O P I N I O N

**HORN, J.**

This case arises from a contract between Oak Environmental Consultants, Inc., (Oak) and the Naval Facilities Engineering Command to repair and renovate housing at the Naval Station in Newport, Rhode Island. The parties filed cross-motions for summary judgment. The plaintiff claims that it is entitled to unabsorbed home overhead expenses as a result of the contract being suspended for an indefinite period of time, and subsequently terminated, without the release of Oak's performance bond. See Eichleay Corp., ASBCA No. 5183, 60-2 BCA ¶ 2688, 13,574 (1960), recons. denied, 61-1 BCA ¶ 2894 (1960). In the alternative, plaintiff also seeks an equitable adjustment under a breach of contract theory. The defendant argues, however, that the delay was not indefinite, did not extend the period of original performance, and that defendant was not responsible for releasing the performance bond. Defendant argues that the plaintiff cannot establish the elements of a breach of contract, nor can plaintiff establish entitlement for damages using the Eichleay formula.

## FINDINGS OF FACT

On September 30, 2002, Oak was awarded the "Anchorage Housing Repair Project at the Naval Station, Newport, RI," contract for $2,453,163.00. The contract stipulated that the renovations were to be completed within one year, on or before September 30, 2003. Two contract modifications were issued in January, 2003 and April, 2003, which did not affect the completion date. The notice to proceed was issued on November 5, 2002, subject to bond authentication. Both performance and payment bonds were obtained in accordance with the Notice of Bonding Requirements clause, which read in pertinent part:

> Within 15 days after receipt of award, the bidder/offeror to whom the award is made shall furnish the following bond(s) each with satisfactory security;
> A Performance Bond (Standard Form 25). The performance bond shall be in a penal sum equal to 100% of the contract price.
> A Payment Bond (Standard Form 25A). The payment bond shall be in a penal sum equal to 100% of the contract price.

The contract also included a Suspension of Work clause, outlining the protocol by which work may be postponed. The Suspension of Work clause read, specifically:

> SUSPENSION OF WORK (APR 1984)
>
> (a) The Contracting Officer may order the Contractor, in writing, to suspend, delay, or interrupt all or any part of the work of this contract for the period of time that the Contracting Officer determines appropriate for the convenience of the Government.
>
> (b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the Contracting Officer in the administration of this contract, or (2) by the Contracting Officer's failure to act within the time specified by this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly.

48 C.F.R. § 52.242-14 (Oct. 1, 2001).

In a telephone call on the afternoon of April 23, 2003, instructions were given to the Naval Station at Newport, Rhode Island by the Commander of the Atlantic Fleet for all work to stop, and to terminate the contract for convenience. On the same day, the order was given to standby for receipt of a formal request to terminate the contract. On the following day, the Naval Station in Newport received internal Navy communications indicating that Oak was to stop work and that the Anchorage Housing was being considered for demolition and possible future privatization and development on the site. Oak's work was verbally

stopped by Naval authorities on April 24, 2003. The Navy did consider whether to have Oak complete the units already partially renovated, but subsequent internal Navy messages indicated that all housing units were to be demolished. On April 29, 2003, the Naval Station in Newport received an e-mail requesting the Naval Station to "hold off on issuing the suspension [of the Anchorage Housing Repair Project] until I get back with you," in order for Navy officials to evaluate certain concerns.

On May 2, 2003, Lieutenant Commander Michael Zanoli, the Resident Officer in Charge, Naval Facilities Engineering Command, who also was a contracting officer overseeing the Newport, Rhode Island Field Office, sent a letter to Oak suspending work on the contract. The letter instructed:

> Your performance of the subject contract is hereby suspended pursuant to contract clause FAR 52.242-14, Suspension of Work (APR 1984) effective immediately through May 01, 2004.
>
> You are to stop all on-site work except that which is necessary to correct all safety deficiencies; prevent damage to existing government property, and secure existing housing units and project materials. Processing of contractually required administrative items (including, but not limited to, submittals and training), ordering of additional contract materials, and any off-site work shall stop immediately.
>
> You are instructed to mitigate any and all costs, including those of subcontractors, (if any), associated with the suspension.

The letter also instructed plaintiff to provide a proposal for the "deletion of all the remaining work under this contract to this office." The contemporaneous record suggests that defendant requested a proposal to delete the balance of the contract in anticipation of possible privatization of the base housing. In an internal Navy memorandum dated May 27, 2003, the pending privatization was confirmed to preclude the need for further renovations, with instructions that the housing be razed and the contract be closed out.

On June 2, 2003, the internal request to terminate the Oak contract was sent from Lieutenant Commander Zanoli to the Newport Naval Station. The communication included a request to develop a plan to properly terminate Oak's contract and to demolish the housing at issue. On July 7, 2003, the Navy requested Oak to provide a close-out proposal by July 11, 2003. Plaintiff responded on July 10, 2003, but indicated that the proposal was incomplete because their consultant still was working on it. Plaintiff also expressed a willingness to meet and discuss terms the following week.

In its August 13, 2003 close out proposal to the contracting officer, plaintiff described direct contract expenses from July 31, 2003 projected through September 30, 2003, the original contract conclusion date, totaling $1,083,836.00 and projected total overhead in the amount of $440,750.00, plus an 8% profit margin only on contract expenses, for a total of

$1,611,293.00. The letter continued by stating that through August 13, 2003, the contractor had billed the defendant $1,190,718.00. Therefore, plaintiff's claim to the contracting officer in its close-out proposal was for $420,575.00. The proposal also listed a number of other unresolved costs, and requested Eichleay damages. Lieutenant Commander Zanoli suggested in a separate document, also sent on June 2, 2003, that a bilateral deductive modification, which could be coded as a termination for convenience, be attempted with Oak regarding the termination.

On September 30, 2003, Oak requested the contracting officer to release its performance bond on the contract so as allow Oak to procure other work and, thereby, mitigate its damages. In an internal Navy memorandum, on October 14, 2003, the Newport Navy staff was directed to prepare the termination for convenience, pursuant to the May 27, 2003 internal Navy memorandum directing contract close-out.

In an October 22, 2003 letter, the contracting officer instructed the plaintiff to repair boiler exhaust stacks which had been installed on a temporary basis by November 28, 2003, because the Navy considered existing conditions a safety deficiency. The letter noted that pursuant to the suspension of work order dated May 2, 2003, Oak's work at the site had been suspended, except work "necessary to correct all safety deficiencies, prevent damage to existing government property, and secure existing housing units and project materials."

Two days later, on October 24, 2003, Oak sent a letter to the Navy which stated: "on site and home office administrative expenses continue" as a result of the attempts to close out the contract and related negotiations continuing beyond September 30, 2003. This letter expressed the plaintiff's uncertainty regarding whether the contract would be cancelled by the Navy, because, as the letter stated, Oak had heard that the defendant might not terminate the contract. The letter also expressed plaintiff's continuing concern about releasing the bond obligation. A November 5, 2003 e-mail from plaintiff to the contracting officer reiterated concerns about its bonding capacity being tied up and again requested a resolution to the close-out proposal. On December 2, 2003, the contracting officer sent plaintiff a follow-up letter to the October 22, 2003 letter directing work on the boiler exhaust stacks, because the work had not begun, and asked for a plan to complete the work by December 4, 2003. The work was completed by plaintiff on February 13, 2004.

On December 12, 2003, the government issued contract modification P00003, by which the contract was terminated for the convenience of the government. As part of the termination, the contract price was reduced by $577,719.00, from $2,453,163.00 to $1,875,444.00. A separate Navy letter was sent to Oak describing detailed steps plaintiff should take following the termination, which included prescribed methods to mitigate costs associated with subcontractors, employees, and inventory. Plaintiff acknowledged receipt of the termination on March 11, 2003.

In a January 6, 2004 e-mail to Oak, contracting officer Denise Abraham noted that contract modification P00003, which terminated the contract, contemplated "potential costs"

to include costs for an "Eichleay proposal," "[s]tored material," "work in place but not paid for," "[w]ork for [boiler] vent stacks," and "subcontractor costs." See Eichleay Corp., 60-2 BCA ¶ 2688, at 13,574. However, the e-mail further noted that the consideration of the costs within the contract modification "does not indicate entitlement to any costs associated with the termination." The e-mail also indicated that $1,095,444.00 had been paid under the contract to date.

On February 9, 2004 and March 8, 2004, after the suspension, the Navy paid invoices from contract funds, primarily related to the boiler stack repair in the amounts of $24,407.21 and $19,193.41, respectively, but also including adjustments for other items based on the percentage of work completed. The defendant asserts that this work constituted remedial repairs. Plaintiff asserts the interim positioning of the boiler stacks was configured at government direction, and that any defects resulting from a government caused delay, and consequent boiler stack repairs, should have been considered additions to the original contract.

In the interim, between the boiler stack repair and payment for the repair, and subsequent to the May, 2003 suspension of work letter, plaintiff had submitted to the Navy various invoices and had supplied additional cost information to support payments plaintiff alleged were due on the contract. The submissions included a request on December 4, 2003, for payment of a corrected balance due and supporting cost information on December 8, 2003. These payment requests related to parts and supplies that had been purchased for the planned renovations. The invoices and accompanying letters contained within the requests consisted, among other items, storage charges for materials and other logistical costs, as well as restocking fees and custom supply charges.

A letter in the record, dated June 22, 2005, and signed by the former Assistant Regional Officer in Charge of Construction on the contract, then Lieutenant, Junior Grade, Nolan Redding, states that plaintiff's performance "was satisfactory in all regards." The letter also states that:

> Although . . . the suspension was for a period of one year, Oak Environmental's bond was not released as it was thought that the privatization would not go through and the project could be restarted anytime. OAK was asked to remain on standby and prepared to continue work during the period in the event the project could be restarted. OAK and the ROICC [Resident Officer in Charge of Construction] office remained in regular contact during this time with regards to either restarting the work or releasing the bond. The bond was finally released on May 17, 2004 terminating the contract for the convenience of the government.

On October 18, 2005, Mr. Redding sent another letter to Oak, which states in its entirety:

> As you know, your firm contacted me in June 2005 seeking help regarding your stated difficulty in obtaining a bond due to issues related to the subject project. It was indicated to me that your new bonding company needed some general background information regarding the suspension and subsequent termination for convenience. The type of information the bonding company needed was provided and I was asked to send them a letter. <u>It was never indicated or discussed that this letter would be sent to the government or used for any other audience than your bonding company.</u>
>
> It has come to my attention that the letter I provided to you dated June 22, 2005 has now been submitted to the government in support of an Eichleay claim for the subject project. I did not intend for this letter to be used for any such purpose other than to provide general information to your bonding company. This letter should not be used in any other context or for any other reason. (emphasis added).

Subsequently, at deposition, under oath, Mr. Redding was asked to explain the context of the June 22, 2005 letter. However, his various explanations were not consistent. In the March 8, 2007, deposition of Mr. Redding, selections of which the defendant submitted to the court as a supplement to the Appendix, the following testimony was offered:

> Q. [Counsel for defendant] I'd like to show you a letter dated June 22nd, 2005. That is part of the joint document appendix that I referred to earlier and this is document number 125. And I just ask you to review this if you would Mr. Redding.
>
> A. [Mr. Redding] Okay.
>
> Q. Are you familiar with this letter?
>
> A. Yes.
>
> Q. Did you write it?
>
> A. Pieces of it.
>
> Q. Who else wrote it?
>
> A. Well, a little background. Bruce Newman from [O]ak contacted me sometime in June. I don't remember the date. But he indicated to me that they were still having some trouble with their bonding company related to this project and would appreciate if a letter could be written to them indicating that . . . there was no negative connotation to the termination.

* * *

Q. Well, what did you mean with the words Oak was asked to remain on stand by?

A. In my mind that the boiler stacks and the safety concerns were the main reason that was in there. I mean, that language was already provided for me when I got the letter from Bruce [Newman, Oak's Director of Operations] but I didn't see anything wrong with that at the time but now in light of an Eichleay Claim it seems to be, you know, and then you continue the sentence talking about that the entire project could be restarted. You know, in my mind I was thinking of still the boiler stacks.

* * *

Q. Did the statement in the second paragraph [that] Oak's bond was not released as it was thought that the privatization would not go through and the project could be restarted at any time, is that a true statement?

A. The part about their bond not being released as far as I knew at that time was true. Although, part of the reason I was questioned on the letter I should have made some phone calls to confirm some of this before I sent it out because at the time I wasn't positive that the -- I only took it on Bruce's word that their bond hadn't been released. I didn't find out officially if it had been or not. So I allowed that to be in the letter. And as far as the privatization would not go through, you know, it did go through so, you know, at the time it wasn't -- I wasn't sure it would go through so.

Pertaining to the same issue, in the March 8, 2007, deposition of Denise Abraham, the contracting officer, which was provided to the court as an appendix to plaintiff's cross-motion for summary judgment, the following testimony was given:

Q. [Counsel for plaintiff] Do you recall receiving any instruction that if you suspended a contractor for a definite period of time that that would save the Government money in terms of having to pay overhead costs?

A. [Ms. Abraham] My understanding is that if it's suspended for a definite period of time there are limited costs that the contractor is then entitled to.

Q. And what about if it's for an indefinite period?

A. I believe there are more costs that that opens up to.

Q. So as a matter of policy in your office in Newport is that why when you issue suspensions it's for a definite period of time?

A. Yes.

In the May 10, 2007, deposition of Lieutenant Commander Michael Zanoli, the Resident Officer in Charge of Construction for the project at issue, a contracting officer, and

Mr. Redding's supervisor, similarly submitted to the court as an appendix to plaintiff's cross-motion for summary judgment, the following testimony was given:

> Q. [Counsel for plaintiff] How did you determine the length of time of the suspension?
>
> A. [Mr. Zanoli] I do not recall how I came up with the date May 1, 2004, why that date.
>
> Q. Had you ever done a suspension of work order before?
>
> A. I don't recall if I have or haven't.
>
> Q. Did you speak to anyone about the time of the suspension that you should put in this letter?
>
> A. I may have, I don't know. I just don't recall.
>
> Q. Did you believe at the time that you issued the suspension letter that the work would resume after May 1, 2004?
>
> A. In my mind at the time we were still waiting for the formal letter request from the Commander [of the] Atlantic Fleet to terminate the contract so there was a slight possibility in my mind that the work could go on absent that official request.

A settlement agreement regarding monies due as a result of the termination for convenience ultimately was executed by both parties. The settlement was issued as contract modification P00004 on August 4, 2005, in the amount of $326,659.00. In a letter attached to P00004, plaintiff reserved the right to seek an equitable adjustment and damages for home office overhead pursuant to the Eichleay formula. These damages were subsequently included by Oak in a certified claim submitted to the Navy on August 26, 2005, in the amount of $344,395.92, for the period May 2, 2003, through the date on which the bonds were released, May 17, 2004, during which time the plaintiff claimed it was effectively precluded from obtaining replacement work. The damages were calculated based on the Defense Contract Audit Agency's (DCAA) allowable overhead of $394,883.94 for 438 days of performance; yielding a daily rate of $901.56. This daily rate of $901.56, multiplied by the 382 days of suspension, equals the plaintiff's claim of $344,395.92.

Plaintiff filed its complaint in this court, in response to the Navy's failure to issue a final decision on the home office overhead damages claim within a 60-day period. In the complaint, plaintiff requests damages in the amount of $344,395.92, plus interest, attorneys fees and other costs allowable by law.

## DISCUSSION

The parties have filed cross-motions for summary judgment. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); Avenal v. United States, 100 F.3d 933, 936 (Fed. Cir. 1996), reh'g denied (1997); Creppel v. United States, 41 F.3d 627, 630-31 (Fed. Cir. 1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; see also Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Curtis v. United States, 144 Ct. Cl. 194, 199 (1958), cert. denied, 361 U.S. 843 (1959), reh'g denied, 361 U.S. 941 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; see, e.g., Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) (nature of a summary judgment proceeding is such that trial judge does not make findings of fact); Johnson v. United States, 49 Fed. Cl. 648, 651 (2001), aff'd, 52 Fed. Appx. 507 (2002), published at 317 F.3d 1331 (Fed. Cir. 2003); Becho, Inc. v. United States, 47 Fed. Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-52; Jay v. Sec'y of Dep't of Health and Human Servs., 998 F.2d 979, 982 (Fed. Cir.), reh'g denied, en banc suggestion declined (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n.3 (Fed. Cir. 1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

> . . . saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

Dehne v. United States, 23 Cl. Ct. 606, 614-15 (1991) (citing Pure Gold, Inc. v. Syntex, Inc., 739 F.2d 624, 626 (Fed. Cir. 1984)), vacated on other grounds, 970 F.2d 890 (Fed. Cir. 1992); see also U.S. Steel Corp. v. Vasco Metals Corp., 394 F.2d 1009, 1011 (C.C.P.A. 1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir. 2001), cert. denied, 534 U.S. 1109 (2002); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir.), reh'g denied, en banc suggestion declined (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); see also Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc., 109 F.3d 739, 741 (Fed. Cir. 1997) (quoting Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994)), reh'g denied, en banc suggestion declined (1997); Lockwood v. Am. Airlines, Inc., 107 F.3d 1565, 1569 (Fed. Cir. 1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. See Celotex Corp. v. Catrett, 477 U.S. at 322; Am. Airlines, Inc. v. United States, 204 F.3d 1103, 1108 (Fed. Cir. 2000); see also Schoell v. Regal Marine Indus., Inc., 247 F.3d 1202, 1207 (Fed. Cir. 2001).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. Prineville Sawmill Co. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); Chevron USA, Inc. v. Cayetano, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000), cert. denied, 532 U.S. 942, 121 (2001). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." LewRon Television, Inc. v. D.H. Overmyer Leasing Co., 401 F.2d 689, 692 (4th Cir. 1968), cert. denied, 393 U.S. 1083 (1969); see also B.F. Goodrich Co. v. United States Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001); Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. B.F. Goodrich Co. v. United States Filter Corp., 245 F.3d at 593; Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000); Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d 1, 2 (1st Cir. 1998); Reading & Bates Corp. v. United States, 40 Fed. Cl. 737, 748 (1998). The court must

evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1322 (Fed. Cir. 2001); Gart v. Logitech, Inc., 254 F.3d 1334, 1338-39 (Fed. Cir. 2001), cert. denied, 534 U.S. 1114 (2002).

Initially, the parties proposed proceeding on cross-motions for summary judgment. After a status conference with the court, the parties determined a need to engage in limited discovery. The parties filed a joint stipulation of facts, and both defendant and plaintiff filed cross-motions for summary judgment, and brief additional statements. On June 1, 2007, the defendant stated:

> Pursuant to this Court's order of June 1, 2007, defendant, the United States, respectfully submits the following individual statement upon whether there are any material facts in dispute which would preclude summary judgment. The Government does not believe that there are any material facts in dispute which would preclude disposition by summary judgment. However, the Government contends that summary judgment only is available in favor of the Government in this case.

On the same date, the plaintiff offered the following:

> The Plaintiff hereby stipulates that there are no material facts in dispute precluding disposition by summary judgment. However, it is noted that the question of whether the suspension of work is definite or indefinite is a mixed question of fact and law that remains open.

Both parties continue to argue in favor of proceeding on summary judgment.

## I. Claims for Recovery of Unabsorbed Overhead and the Eichleay Standard

The issue in this case is whether Oak Environmental Consultants, Inc., can recover unallocated home office overhead expenses that otherwise would have been absorbed by the Anchorage Housing Repair Project contract, but for the Navy's suspension, and subsequent termination and the absence of the bond release. Defendant suggests, that in addition to a claim for Eichleay and breach of contract damages, plaintiff also has alleged bad faith on the part of the government, notwithstanding plaintiff's counsel making clear that no claim for an action predicated on a theory of bad faith was put forth. Although defendant cites paragraphs 11, 12, 19 and 20 of the complaint in support of this assertion, the term "bad faith" is neither included within the text of those paragraphs of the complaint, nor within the text of the document as a whole. Plaintiff does characterize the Suspension of Work order as a "cleverly designed subterfuge," but incorporates this as a factor for consideration within the context of the overhead damages claim under both its Eichleay and breach of contract theories. Therefore, the court need not consider the issue of bad faith as a separate issue.

As part of the August 4, 2005, settlement agreement between the parties, which resolved the Termination for Convenience costs, the plaintiff reserved its "right to file a request for equitable adjustment, or a claim, for home office overhead pursuant to the Eichleay formula."[1] "Home office overhead typically includes accounting and payroll services, salaries for upper-level managers, general insurance, utilities, taxes, and depreciation." Id.; see also Wickham v. United States, 12 F.3d 1574, 1574 (Fed. Cir. 1994). In an appeal from the United States Court of Federal Claims, the United States Court of Appeals for the Federal Circuit stated that "the Eichleay formula is the only means approved in our case law for calculating recovery for unabsorbed home office overhead." Melka Marine, Inc. v. United States, 187 F.3d 1370, 1374-75 (Fed. Cir. 1999), cert. denied, 529 U.S. 1053 (2000).

As stated in the Eichleay case, "[t]here is no exact method to determine the amount of such expenses to be allocated to any particular contract or part of a contract . . . . [I]t is not necessary to prove a specific amount of [home office expenses], but only to determine a fair allocation for the purpose of compensating a contractor for delay by the Government." Eichleay Corp., 60-2 B.C.A. ¶ 2688, at 13,574. Standby, combined with the inability to take on additional work are two of the triggers for employing the Eichleay formula. Id. at 1577-78; Nicon, Inc. v. United States, 331 F.3d 878, 889 (Fed. Cir. 2003).

The Eichleay formula calculates allocable overhead costs as the ratio of billings of the subject contract to total firm billings during the contract period, multiplied by the total overhead incurred, divided by the actual days of performance, times the number of days the contractor was delayed. Eichleay Corp., 60-2 BCA ¶ 2688, at 13,574. In Eichleay, the basic formula was outlined as:

> an allocation of the total recorded main office expense to the contract in the ratio of contract billings to total billings for the period of performance. The resulting determination of a contract allocation is divided into a daily rate, which is multiplied by the number of days of delay to arrive at the amount of the claim.

[1] Plaintiff's claim currently before the court, which was properly certified to the contracting officer, and deemed denied after no decision was forthcoming, represents plaintiff's Eichleay or equitable adjustment claim calculated in accordance with the DCAA's audit. Plaintiff also has included an alternate breach of contract theory for recovery of their unabsorbed overhead based on the defendant's failure to release the bonds. Although the United States Court of Claims, a precursor court to the United States Court of Appeals for the Federal Circuit, formerly may have assessed such office overhead under a breach of contract theory, see e.g., Fred R. Bomb Co., v. United States, 103 Ct. Cl. 174, 183-184, 1945 WL 4033 (1945), the precedent cited in this opinion directs application of the Eichleay standard for unabsorbed overhead as the only proper methodology. Although not supporting a breach of contract theory of recovery, the status of the bonds and responsibility to occasion release of the bonds can come into play in assessing Eichleay damages.

Eichleay Corp., 60-2 BCA ¶ 2688, at 13,574. Stated otherwise:

> Determining the amount of recoverable damages under the "Eichleay formula" requires three steps: (1) find the allocable contract overhead by multiplying the total overhead cost incurred during the contract period by the ratio of billings from the delayed contract to total billings of the contractor during the contract period; (2) find the daily contract overhead rate by dividing the allocable contract overhead by the number of days of contract performance; (3) determine the amount recoverable by multiplying the number of days of delay by the daily contract overhead rate. See Wickham Contracting Co., 12 F.3d at 1577 n.3.

Melka Marine, Inc. v. United States,187 F.3d at 1375.

More recently, the Federal Circuit has explained that:

> The Eichleay formula is used to calculate the amount of unabsorbed home overhead a contractor can recover when the government suspends or delays work on a contract for an indefinite period. Melka Marine, Inc., v. United States, 187 F.3d 1370, 1375 (Fed. Cir. 1999) (citing Eichleay Corp., ASBCA No. 5183, 60-2 B.C.A. (CCH) ¶ 2688 (A.S.B.C.A. 1960)). To show entitlement to these damages, the contractor must first prove there was a government-caused delay to contract performance (as originally planned) that was not concurrent with a delay caused by the contractor or some other reason. Sauer Inc. v. Danzig, 224 F.3d 1340, 1347-48 (Fed. Cir. 2000). The contractor must also show that the original time for performance of the contract was thereby extended, or that he finished the contract on time or early but nonetheless incurred additional, unabsorbed overhead expenses because he had planned to finish even sooner. Interstate Gen. Gov't Contractors, Inc. v. West, 12 F.3d 1053, 1058-59 (Fed. Cir. 1993). Once the contractor has proven the above elements, it must then prove that it was required to remain on standby during the delay. Id. If the contractor proves these three elements, it has made a prima facie case of entitlement and a burden of production shifts to the government to show that it was not impractical for the contractor to take on replacement work and thereby mitigate its damages. Melka, 187 F.3d at 1376. If the government meets its burden of production, however, the contractor bears the burden of persuasion that it was impractical for it to obtain sufficient replacement work. Id.

P.J. Dick, Inc. v. Principi, 324 F.3d 1364, 1370 (Fed. Cir. 2003). This approach normalizes the overhead allocation calculation and assumes proportional distribution of overhead among all projects for the purpose of unabsorbed overhead allocation recovery. See John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts, 720 (4th ed. 2006).

The fundamental principles outlined above for calculation of Eichleay damages in cases seeking unabsorbed home office overhead were reiterated by the United States Court of Appeals for the Federal Circuit in Nicon, with the following cautionary words:

> [T]he Eichleay formula is only applicable in situations in which contract performance has begun. However, that does not mean that a contractor, who is required to remain on standby because of a government-caused delay but is never allowed to begin performance, may not receive some of its unabsorbed home office overhead as part of its termination for convenience settlement by some other method of allocation.

Nicon, Inc. v. United States, 331 F.3d at 884.

In the instant case, the parties do not dispute that Oak had commenced construction and partially performed the contract when told to suspend performance. This allowed the DCAA to make an overhead calculation, because performance and the associated billings could be compared to the contract's total billings, which is essential to compute Eichleay damages.

### A. Was there a government delay extending the completion date?

The contractor first must demonstrate that there was a government caused delay to contract performance (as originally planned), that was not concurrent with a delay caused by the contractor or for other reasons. P.J. Dick, Inc. v. Principi, 324 F.3d at 1370. The original completion date of the contract was September 30, 2003. On its face, the suspension of work letter to Oak does not give a reason for the suspension. Defendant argues that the completion date was not extended because no work, other than work to secure a safety deficiency, was performed subsequent to the suspension end date. Defendant also states that because "OAK was advised that the suspension was due to pending housing privatization [Oak] had no reasons to conclude that it would be called back to work during the suspension period." According to the defendant:

> [T]he issue in Eichleay is not whether the formal contract completion date changed. Rather, it is whether, in fact, the contractor was compelled to perform work on the project for a longer period of time, leading to higher overhead costs. Here, even though, in theory, the suspension could have caused an extension in the contract completion date, because the work was terminated, there was no extension in fact.

From the face of the suspension letter, although in the same letter the contractor was also asked for a proposal for deletion of remaining work under the contract, whether work would resume remained entirely within the discretion of the defendant. There was no actual date of project completion or termination, only a suspension end date, which did not foreclose the conclusion that the order of suspension had revised the projected completion date, and that resumption of the work could have been required of the plaintiff at anytime.

Moreover, by the government's own admission, and based on the record, the stoppage was ordered because the government was contemplating privatization of the base housing and potential demolition of the existing housing units.

Defendant argues that the boiler stack work completed subsequent to the date of suspension constituted remedial work under the contract, apparently as a response to a suggestion that not all the work was suspended. After the suspension letter was issued, the contractor was directed to, and did, repair the boiler stacks due to unsafe conditions generated by an earlier temporary remedy, occasioned by weather conditions, and which plaintiff argues was government directed.

The standard under this Eichleay element is that "the contractor must show effective suspension of much, if not all, of the work on the contract." P.J. Dick, Inc. v. Principi, 324 F.3d at 1371; see also Altmayer v. United States, 79 F.3d 1129, 1134 (Fed. Cir. 1996) ("Nor is recovery under Eichleay compromised because [plaintiff] continued to perform minor tasks throughout the period of government indecision."). Given the relatively low value (approximately $43,000); the minimal ten-day duration of the boiler stack post-suspension work compared to that of the total contract work suspended; the fact that the parties knew in advance of the suspension that this work would have to be accomplished; and that, based on the record currently before the court, the government had not only ordered the temporary connection, but also paid plaintiff to change the configuration, this requirement for Eichleay damages has been met. The government's issuance of the May 2, 2003 Suspension of Work letter, in order to consider its privatization option, appears to have created a government caused delay in the continued performance of the contract over which the contractor had no control.

**B. Was the delay indefinite and substantial?**

The plaintiff stipulated that the question of whether the suspension was indefinite is the main issue in dispute and is characterized as one of both law and fact. The suspension of work under the terms of the letter of suspension was to last for one year, from May 2, 2003 until May 1, 2004. The original total contract length was for a one year period from September 30, 2002 to September 30, 2003. A one year work period suspension, on its face, is substantial, and the net effect of extending the contract seven months from the original end date of September 30, 2003 to May 1, 2004, also is substantial, especially since the contract was partially completed when the suspension was issued.

Contrary to plaintiff's position that, regardless of whether the suspension was indefinite, Eichleay or Eichleay-like damages are recoverable, such indefiniteness is essential in determining whether a contractor has been forced into standby mode. See P.J. Dick, Inc. v. Principi, 324 F.3d at 1371 ("[T]he contractor must show that the government caused delay was not only substantial, but was of an indefinite duration."). Indefiniteness is the very characteristic that distinguishes a period during which resources can be allocated elsewhere, versus one in which the uncertainty of resumption creates a risk of breach if a contractor does not stand at the ready. The indefiniteness, as related to home office

overhead, restricts a contractor from making organizational changes that could otherwise be made, such as "laying off" employees and shifting resources elsewhere. See Wickham Contracting Co. v. United States, 12 F.3d at 1577-78; see also Capital Elec. Co. v. United States, 729 F.2d 743, 748 (Fed. Cir. 1984) (Friedman, J., concurring) ("[I]t is, ordinarily, not practicable to lay off main office employees during a short and indefinite period of delay.").

In making the inquiry as to whether the contractor was put on standby, the court should first determine whether the contracting officer has issued a written order that suspends all the work on the contract for an uncertain duration and requires the contractor to remain ready to resume work immediately or on short notice. See Interstate Gen. Contractors, Inc. v. West, 12 F.3d 1053, 1055, 1057 n.4 (Fed. Cir. 1993); see also P.J. Dick Inc. v. Principi, 324 F.3d at 1370; Melka Marine, Inc. v. United States, 187 F.3d at 1376. The suspension letter in the instant case contains somewhat inconsistent direction. The language of the suspension is, "Your performance of the subject contract is hereby suspended . . . effective immediately through May 1, 2004." However, at the end of the same letter, the government requested the contractor to submit "a proposal for the deletion of all remaining work under this contract." There is nothing in the letter to relieve the contractor of its contractual responsibility to resume work on the contract if called to do so by the government, or that a proposal to delete the remaining work on the contract would be accepted by the Navy. The contractor may have known that privatization of the buildings on site was being considered by the Navy. However, at the time Oak received the suspension letter, and for a period thereafter, plaintiff's understanding was that no formal decision regarding the future of the Navy base housing had been made, and subsequently even that the order might be under reconsideration. In sum, it appears that it may not have been unreasonable for the contractor to be uncertain as to when or if the contract performance would resume, and for plaintiff to consider the suspension indefinite. Moreover, without the release of its bonds, which did not occur until May, 2004, the contractor was unable to obtain replacement work.

Defendant attempts to rely on Nicon, Inc. v. United States, to allege that plaintiff "subtly attempts to change" the performance requirement for recovery of Eichleay damages, and that "Eichleay damages are only available when the delay causes contract performance to require more time than anticipated." Nicon, Inc. v. United States, 331 F.3d at 884. However, defendant's reliance is misplaced. The Nicon court made it clear that the factual context in which Eichleay disputes arise must be considered. Id. at 884-85. Further, Judge Newman explained, in her concurrence, that:

> Application of the Eichleay method of measuring compensation for unreimbursed overhead is not controlled by whether the contract is eventually performed or whether it is eventually terminated without performance. During the period when the contractor is required by the government to stand by, neither the contractor nor presumably the government knows whether the contract will be cancelled eight months later. It is the standby suspension of uncertain duration that creates the situation for which the Eichleay formula

> was devised; whether or not performance had begun before the suspension was imposed does not produce a "drastic shift" in the application of the formula. C.B.C. Enterprises, Inc. v. United States, 978 F.2d 669, 675 (Fed. Cir. 1992).

Nicon, Inc. v. United States, 331 F.3d at 888 (Newman, J., concurring in part). Otherwise, Eichleay damages would be unallocable in all cases in which a suspension is issued, and before the original contract completion date, the contract is terminated.

Defendant further argues that the plaintiff could not believe that the suspension was indefinite because the suspension was due to the privatization of the subject matter housing, and, therefore, plaintiff "had no reasons to conclude that it would be called back to work during the suspension period." In the first place, Oak did not have access to the internal e-mails exchanged between the Navy officers regarding the possible privatization and demolition of existing housing. Moreover, if defendant was certain that Oak was not to be called to return to work on the project, it should have terminated, rather than suspended, the contract.

Plaintiff points out that the government's choice, to issue a suspension notice as opposed to a contract termination notice, which the plaintiff argues was deliberate, was a reflection of hope on the part of Rhode Island Navy officials that, despite directives, from Navy officials to the contrary, the order directing privatization might be rescinded and the work on the project allowed to continue. As a result, in order to preserve the option to continue under the contract, and because a suspension, and not a termination order was issued, Oak's bond was not released, in spite of repeated requests by Oak to have it released, further contributing to the indefinite nature of the suspension. As a result, Oak was forced to remain on standby, without the ability to obtain replacement work. As a small company with limited bonding capacity, Oak was unable to obtain additional bonding, allowing it to take on replacement work.

Based on the record, Oak did not have definitive information as to whether or not a final decision on privatization had been made, leaving it with the impression that work on the contract might resume. In fact, in plaintiff's certified claim, dated August 26, 2005, the president of Oak wrote to the Navy Resident Officer in Charge of Construction:

> The facts however do not support your contention that we were not held on indefinite stand-by or that we were able to obtain replacement work. The facts clearly show that the Navy directed us to remain on standby and to remain ready to return to work immediately, which in fact the Navy ordered us to do. While your letter of 2 May 2003 suspended our work "effective immediately through 1 May 2004", the Navy did not release our bond until 17 May 2004, effectively preventing us from obtaining "replacement work". We had numerous conversations via telephone and email (examples attached) with then Contracting Officer Denise Abraham and then Asst. ROICC Lt. Nolan Redding attempting to obtain release of our bond so that we could

> pursue replacement work. We were told repeatedly that our bond would not be released because the ROICC hoped that the privatization of base housing would not go through and we would be called upon to resume work immediately. The ROICC did not want the project delayed by our having to re-obtain bonding.
>
> * * *
>
> Even after release of our bond, the Navy's over two year delay in dealing with the termination has continued to foster a lack of confidence by our bonding company, further exacerbating our ability to obtain the bonds necessary to continue our business. In order to mitigate the bonding firm's fears, we had to obtain a letter from the Navy (attached) which lists the reasons for the termination and the Navy's delay in closing out the matter. That letter (attached) written by former Lt. Nolan Redding of your ROICC office clearly states that we were held on indefinite standby, that we could be recalled at any time. As further evidence of the fact that [we] were ordered to remain on standby and prepared to immediately resume work, we were ordered to resume on site work December of 2003 and continued working until February of 2004.

The letter to which plaintiff's president referred as support for Oak's position is the one dated June 22, 2005, from Nolan Redding, who, at the pertinent time, was the Assistant Regional Officer in Charge of Construction, and in charge of the Oak project. Mr. Redding's letter stated:

> Although the suspension letter states that the suspension was for a period of one year, OAK Environmental's bond was not released as it was thought that the privatization would not go through and the project could be restarted anytime. OAK was asked to remain on standby and prepared to continue the work during this period in the event the project could be restarted. OAK and the ROICC [Resident Officer in Charge of Construction] office remained in regular contact during this time with regards to either restarting the work or releasing the bond. The bond was finally released on May 17, 2004 terminating the contract for convenience of the government.

Although there is little reason to doubt the authenticity and sincerity of Mr. Redding's first letter, dated June 22, 2005, he essentially reinforced his earlier statements on October 18, 2005, although he inartfully tried reduce the impact of his earlier letter. He stated:

> As you know, your firm contacted me in June 2005 seeking help regarding your stated difficulty in obtaining a bond due to issues related to the subject project. It was indicated to me that your new bonding company needed some general background information regarding the suspension and subsequent termination for convenience. The type of information the bonding company needed was provided and I was asked to send them a letter. <u>It was never indicated or discussed that this letter would be sent to the</u>

> government or used for any other audience than your bonding company.
>
> It has come to my attention that the letter I provided to you dated June 22, 2005 has now been submitted to the government in support of an Eichleay claim for the subject project. I did not intend for this letter to be used for any such purpose other than to provide general information to your bonding company. This letter should not be used in any other context or for any other reason. (emphasis added).

Subsequently, at a deposition, while under oath, the same Mr. Redding, offered a third explanation, implying that he was not the true author of the letter, by stating that the language in the letter which he signed, was provided to him and that he did not check the information independently. He also tried to temper the words in his first letter regarding whether Oak was asked to remain on indefinite standby by saying he was only thinking of the boiler stacks, although he also admitted that, at the time of the suspension, he was uncertain as to whether the privatization would go through.

Defendant tries to dismiss the issues surrounding plaintiff's bonding capacity as none of its responsibility. In its brief filed with this court, the government argues that the Navy had no duty to release the bonds and that whether Oak should have been released from its bond or bonded on other projects was a matter between Oak and its bonding company.

The bonding issue is significant in several ways, including the assessment of whether the burden of going forward has shifted to the defendant as part of proving that the contractor "suffered no loss or should have suffered no loss." See Appeal of Eichleay Corp., ASBCA No. 5183, 61-1 BCA ¶ 2894, 1960 WL 684, at *2 (A.S.B.C.A. 1960); see also Capital Elec. Co. v. United States, 729 F.2d at 749-46. In Melka Marine, Inc. v. United States, the Court of Appeals for the Federal Circuit held that:

> [T]he government can effectively rebut a contractor's *prima facie* case and show that a claimant is not entitled to any Eichleay damages by showing that it was not impractical for the contractor to take on true replacement work and that work would contribute the same amount of money for the same time period toward overhead costs as the government contract would have, had the delay not occurred.

Melka Marine, Inc. v. United States, 187 F.3d at 1379; see also Orlosky, Inc. v. United States, 68 Fed. Cl. 296, 316 (2005) (holding defendant must show plaintiff either took on replacement work or that it was practical to do so), appeal dismissed, 180 Fed. Appx. 928 (Fed. Cir. 2006). The court in Melka Marine continued, stating that the burden, although heavy, was appropriate for the government as it "has the ability to control whether a contractor is on standby status during a suspension of work." Melka Marine, Inc. v. United States, 187 F.3d at 1380.

Moreover, recovery of Eichleay damages is not blocked even if some bonding capacity remains on the part of the contractor. The court in Ryco Construction, Inc., held that:

> [T]he mere fact that a contractor can take on some additional work is not sufficient to eliminate Eichleay damages as a possible means of recovery. Melka Marine, Inc. v. United States, 187 F.3d 1370, 1376-77 (Fed. Cir. 1999). Additionally, the Federal Circuit has noted that a contractor can have some excess bonding capacity and still qualify for Eichleay damages. West v. All State Boiler, Inc., 146 F.3d at 1375. Because plaintiff had reduced bonding capacity, an inference can be drawn that it was impractical for it to take on additional work.

Ryco Constr., Inc. v. United States, 55 Fed. Cl. 184, 202 (2002).

In summary, the suspension letter is not clear. Although May 1, 2004 is provided as the end date for the suspension, the letter also requests a contract close-out proposal, suggesting that the government was unsure about how it would proceed. Moreover, there is insufficient evidence in the record to buttress or deny plaintiff's allegations that Oak was put on standby. Internal Navy e-mail traffic was circulating which discussed the possible privatization of the site, but these e-mails were not shared with the plaintiff, or intimated in the suspension letter. Local Navy officials in Rhode Island, the site of the housing, which was the subject of the contract at issue, apparently continued to hope that the privatization decision would not be implemented by the Navy. There is some evidence that plaintiff's ability to obtain replacement work may have been deliberately impaired by the government, to the point of Oak's inability to do so, in order for the defendant to be able to order the plaintiff to resume work at any time if privatization did not go through. Furthermore, the dialogue that Mr. Redding essentially had with himself in his two letters and subsequent deposition testimony reinforces that the suspension may well have been indefinite. Plaintiff also seems to have had a reasonable understanding that the privatization was not certain, and that it was put on standby for that reason.

Fact finding is necessary on the issues of whether government officials suspended the plaintiff's work indefinitely in order to preserve an option to resume performance if privatization did not occur. Moreover, based on the government's role in not assisting to release Oak's bonds, a question remains as to whether these certain government officials deliberately acted to withhold release of the bonds in order to force Oak to standby for future work. At issue, in part, is whether Mr. Redding's original June 22, 2005 letter, his second letter of October 18, 2005, or his deposition testimony provides accurate representation of the government's intentions. If government officials anticipated a resumption of the contract as a possibility, or withheld Oak's bonds as the mechanism to effectuate suspension and ensure the ability to resume performance immediately, this could start the plaintiff on the road to entitlement. Thus, if it is proven that the government tried to have Oak available for "quick start-up and early completion," and the government acted to

accomplish this result, it will be found to have placed Oak on standby. Melka Marine, Inc. v. United States, 187 F.3d at 1380.

## CONCLUSION

For the foregoing reasons, the court **DENIES** plaintiff's and defendant's cross-motions for summary judgment. A status conference to discuss further proceedings will be scheduled by separate order.

**IT IS SO ORDERED.**

**s/Marian Blank Horn**
**MARIAN BLANK HORN**
**Judge**